## DOUGLASS v. PAINE.

1. PRINCIPAL AND AGENT—SCOPE OF AUTHORITY—EVIDENCE.

In an action for the unlawful sale and conversion of certain stock, which defendants had purchased for plaintiff upon her order, given to one of defendants' agents, evidence that the agent had no authority to make a contract obligating defendants to purchase the stock is admissible to show that the contract was made where the order was executed, and not where it was given.

2. CONTRACTS—PLACE OF EXECUTION.

Where plaintiff, who lived in this State, directed defendants, through their agent in this State, to purchase certain stock, which order defendants, who lived and transacted business in Massachusetts, executed in that State, the contract was made in Massachusetts.

3. SAME—WHAT LAW GOVERNS.

A contract is to be interpreted according to the law of the place where it is made, unless by the terms or nature of the contract it appears that it was to be executed in another State or country, in which case the law of the place of execution governs.

4. SAME—INTENTION OF PARTIES.

Where plaintiff, residing in this State, ordered of defendants, through their agent in this State, stock which defendants, who were residents of Massachusetts, purchased in that State, and for which, according to an established custom, plaintiff paid in this State, but was entitled to pay for in Massachusetts or elsewhere, no intent to have performance of the contract take place elsewhere than in Massachusetts is apparent, and hence the law of Massachusetts governs.

5. SAME—INTERPRETATION—QUESTION OF LAW.

Where the testimony in reference to the terms of an oral contract is not in conflict, interpretation of the contract is for the court.

Error to Houghton; Streeter, J. Submitted June 23, 1905. (Docket No. 56.) Decided September 28, 1905.

Case by Nellie B. Douglass against William A. Paine

and Charles H. Paine, copartners as Paine, Webber & Company, for the unlawful sale and conversion of certain shares of stock.    There was judgment for plaintiff, and defendants bring error.    Reversed.

*Gray & Stone*, for appellants.

*Ball & Ball*, for appellee.

HOOKER, J.   The plaintiff is a married woman, residing at Houghton, in this State.   Defendants are stockbrokers, residing and doing business at Boston, Mass. They also maintain a branch office at Houghton, Mich., in charge of one Mr. Dee, a salaried employé of the defendants; the sign over the door of his office being "Paine, Webber & Co.   Thomas S. Dee, Manager."   The plaintiff occupied rooms in the same building at the time of the transaction which gave rise to this action.   The action was brought to recover damages for the alleged unlawful sale and conversion of some Copper Range stock which defendants had purchased for the plaintiff.   She recovered a judgment in the circuit court, from which the defendants have appealed.

The principal question arises over the defendants' claim that the court should have directed a verdict in their favor.   A consideration of this question will require a brief statement of the facts of the case made by the plaintiff's evidence.   What has been said regarding the residence and character of the business of the defendants were admitted facts.   The plaintiff testified that she was cognizant of such facts, and commenced dealing with the defendants in May, 1901, when they purchased for her New York Elevated stock, upon her verbal order given to Mr. Dee at Houghton, as was her uniform custom.   She said in her testimony:

"Aside from that, I have purchased stock through them on several occasions.   I always gave the order to purchase the stock to the manager, Mr. Dee, in the office of Paine, Webber & Co., in this village.   Whenever I have given

those orders, the purchases have always been made for me. I always gave a verbal order to buy the stock— never a written order. After I gave the orders I would always learn from Mr. Dee that the stocks had been purchased and the prices paid for same. I never had any statements in writing of stocks purchased. I suppose statements of my account came to their office, but they were never sent to me. I got my information as to what they had purchased, and the prices charged to me, from what Mr. Dee told me.    *    *    *

"I didn't want Mr. Douglass to know about these various dealings. He didn't know anything about them, and I didn't wish him to know. I asked Paine-Webber not to mail me anything direct; that I would get things at their office. Everything came to their office, and I requested, when any statement was sent me from the East, that it should be sent to the office here under cover."

Her attention being called to the purchase of the Copper Range stock, she said:

"I went to the office this day with a friend who was holding some Copper Range, who went there for the purpose of selling it, and asked me to go with her for that purpose, and we went to the office, and she told Mr. Dee that she wanted to sell her Copper Range that day, and Mr. Dee told her that she must not think of selling it, and that it was going into the consolidation at $112.50—was to be consolidated with Baltic; that he had a telegram from Boston stating that this would be the kind of consolidation before the middle of September, and he showed that telegram to this party, and she decided not to sell her stock. He showed the telegram to me, and asked me why I did not sell 100 shares of Union Pacific, which I was carrying in their office at that time, and which was a dividend-paying stock, and which I had as an investment —why I did not sell that and buy Copper Range, 200 shares of Copper Range. I told him, if I sold the Union Pacific, I sold it at a loss; but he said, if this goes into the consolidation at that time, you will make so much more you could afford to take that small loss, and, after talking it over, on his advice I told him that he could purchase —could sell the Union Pacific for me, and purchase 200 shares of Copper Range stock for me. The telegram was signed by one of the Paines. It was not a table telegram, as I have seen those frequently. The telegram

was sent to Thomas S. Dee, and it said: 'Advise customers to buy Copper Range. Will go into the consolidation before September 15th at $112.50.' It was not written on any table telegram. Those usually, I think, are put on the typewriter. I gave Mr. Dee an order to sell my Union Pacific at a loss, which was an investment and a dividend-paying stock, on his advice, and bought 200 shares of Copper Range—gave him an order to buy it. I do not know exactly what my loss was on the sale of the Union Pacific, but I should say between $400 and $600. Paine, Webber & Co. held at that time a Union Pacific 4 per cent. bond for $1,000, and 25 shares of National Bank stock of Houghton, a dividend-paying stock, and I had paid in about $1,000 in cash. The bank stock was paying 12 per cent. on the par value. It would be worth about $300 a share, I suppose. Afterwards I was informed by Mr. Dee that they had bought 200 shares of Copper Range for me at $82.50. I got that information that same afternoon. I did not get any written statement of it. He just told me. That stock was bought on the 22d of August, and Mr. Dee left on the 27th, five days later, and there was Sunday intervening, I think. After Mr. Dee told me that I had no further communication with him in regard to it up to the time he went away. Mr. Foster took his place in the office at the time he went away on the 27th. Mr. Foster took charge of the office, I believe, on the 28th. Mr. Dee left on the 27th. On Wednesday morning, the 28th, Mr. Foster sent the office boy to my door to ask me to come to Paine-Webber's office. I went there and had an interview with Mr. Foster in the private office. He told me that I must either put up more collateral on the stock that they had bought for me or close out part of the stock. I told him that they had the same margin that they had when they bought the stock for me as an investment, and that, as the stock had not depreciated in value, I refused to put up more margin, and I told him that he should not close out any of my stock, and he told me that those were the orders, and that he would close out the stock, and he closed out 100 shares of Copper Range. He told me that morning that he would close it out, and told me the next day that he had sold 100 shares at $80. I told him that he had no right to close it out; that Mr. Dee bought the stock for me, advised me to buy it on the margin that I had there; and, as the stock had

not depreciated in value, that I would compel the firm to put it back. I wrote Mr. William A. Paine a letter stating the facts of the case to him, and they returned that 100 shares Copper Range to my account, and put it back at $80, charging commission both ways. I cannot state the exact time that I learned that the stock was put back in my account. They have it in the statement that it was put back on the 6th of September, but it was put back before that. I should say that Mr. Foster informed me that the stock had been put back as early as the 4th or 5th. I learned it then from Mr. Foster, and I also had a letter from Mr. Paine, stating that he had put the stock back. At the time Mr. Foster told me that the stock had been put back he said that he was only acting according to orders; that he had orders to sell the stock or have more margin on it, and, of course, he said, if Mr. Paine put it back, it was all right, and that he had put it back in the account; but they charged commission both ways, taking the stock out at $80, and putting it back at $80. They charged one-eighth of 1 per cent. for buying, and the same for selling. I believe that is their rule. I mean to say that when they sold my stock against my protest they charged me a commission for selling it, and when they put the stock back on my demand they charged me a commission for putting it back—the same commission that they had charged for selling it. That would be $12.50 commission each way, making in all $25. On the 6th of September, the day that President McKinley was shot, I gave Mr. Foster an order to sell 100 shares of Missouri Pacific, a dividend-paying stock that they were holding for me —to sell that because I thought it was going down in price; and I talked with Mr. Foster whether I should sell that 100 shares of Missouri Pacific, which was a dividend-paying stock, or sell the 200 shares of Copper Range which were in my account, and he advised me not to sell the 200 shares of Copper Range, because it was going to advance so much when it went into the consolidation, which would take place within. a very short time. He advised me very much against it —if I wanted to sell any stock to sell the Missouri Pacific; and I gave him an order to sell it, 100 shares. He told me afterwards that he had sold it. It was sold at about $102 a share according to his report, and I lost $2,000 by the sale of that stock. The money was retained by Paine, Webber & Co., and credited on my account. That was

all that took place at that time in regard to stock transactions. The next communication I had with Paine, Webber & Co., or their manager here, in regard to stock account, was on Tuesday morning, September 24th. Between this day and the day on which I ordered the sale of the Missouri Pacific, I had had no communication with them at all in regard to this stock transaction, nor had I been called upon during that time to put up any more money or security, nor had it been intimated to me in the meantime that my account was poorly secured, and that any sale would be made of my stock. On the 24th of September Mr. Foster sent the office boy to my door to ask me to come to the office; that he would like to see me. We were living in the same building with Paine-Webber's office at that time. I went to the office of Paine-Webber, into the private office, and Mr. Foster told me that my 200 shares of Copper Range was sold, and told me the price they had got for it. When I talked with him about it, he said that the stock went down, depreciated in value, and that they were obliged to sell it to protect themselves, which they did. I told Mr. Foster that they had no right to sell the stock without giving me notice and without my order. He claimed that they had a right to sell it, and that they had sold it. I told him that I would see Mr. Paine about the sale of the stock, and that they had no right to sell it without an order, and he claimed that the margins were lower than they allowed the account to be in the office, and that he had a right to sell it. There was no agreement as to what amount of margin was to be kept, nor was there any such agreement at any time. At the time I bought the stock the margin was never mentioned, because I had ample margin to buy the stock as an investment at that time. He told me that he had sold it for $60.50 and $61, I think, and $60. It made a loss of about $4,500 on the Copper Range stock. Afterwards I saw Mr. Dee and talked with him about it. I had told Mr. Foster that I would not allow that they had a right to sell the stock, and he told me that he was acting under orders, and that he could not do anything about it. I asked him to put the stock back in my account, and he said that he could not do that, and that Mr. Dee would be home soon, and I could talk with him about it. It was about a week after that before I talked with Mr. Dee about it, and he told me that, if he had been here, it

would never have happened, and I told him that this wiped out my credit, and that I would not allow that my stock was sold, and that they should put it back to my account, with the collateral that I had up at that time. Mr. Dee said that he could not do anything about it; that I would have to talk with Mr. Paine about it. But he said: 'Had I been here, it never would have happened.' He said that he was powerless to do anything; that he couldn't do anything about it; and that Mr. Paine would be here soon, and he would appoint an interview, so that I could talk with him in regard to it. After talking with Mr. Dee on or about the 3d or 5th of October I wrote Mr. Paine a letter—Mr. William A. Paine—in regard to their closing out my stock, and told him that they had closed the stock without notice, and asked him to put it back in my account. I never received any reply to that letter, and I talked with Mr. Dee in regard to that.

" *Mr. Ball* (to Mr. Gray): Have you got that letter ?

" *Mr. Gray:* No; we haven't for a reason.

" *Witness* (proceeding): Mr. Paine never made any reply to that letter, and Mr. Dee told me that he would be here soon, and that he would appoint an interview for me to see him, and let me know when I could see Mr. Paine. He was here the last of October, or in November. I went to the private office and told Mr. Paine that I thought they had used my stock in a very wrong manner in selling it without proper notice, and Mr. Paine said that the margin was reduced, and that they had the right to sell that stock, and that he would not do anything about it at all, and said that, even at the price it sold, the stock account showed a loss to them at the price it was at that time, and, of course, as I had had all this worry and sleeplessness over the account, I think I cried a little and talked with Mr. Paine and tried to persuade him to do something for me in regard to the matter, which he refused to do. He at that time tried to persuade me to give them a note for the difference in this account for what they had sold the stock, and I told him that I didn't consider that I owed them anything, that I thought the debt was the other way, and I refused to give any note or make any settlement with him whatever. He asked me to sign a note for the difference that showed in this account at the time, and what he called this collateral note that they had up. He said that he only called the securities that I had up worth $6,000— the bank stock $5,000, and the Union Pacific bond $1,000;

and he said there was a loss of about $1,200. It was that amount that he wanted me to give him a note for. He had those securities, of course. I wanted him to return those to me and put the stock back in my account—the 200 Copper Range which they had sold. And Mr. Paine said that he couldn't do that as the account stood; that I owed him this amount of money over and above the value of the securities. I told him that I would not recognize the sale; that I would not give him any note, because I would not recognize the sale. The Union Pacific bond that I had up with them as security was my own. The 25 shares of Houghton National Bank stock belonged to Mr. Douglass, and they knew it at the time they took it as collateral. At the time when the bank stock was put up Mr. Dee had asked me for additional margin. This was before the Copper Range was bought, and I asked Mr. Douglass if he would let me take his stock to put up on Missouri Pacific, of which I had 100 shares; that it was a dividend-paying stock, and I asked him to loan me this bank stock, and he gave me—well, I don't know what you call it—power of attorney, or something, with the stock. Mr. Dee understood. He was called to the bank. He understood that the stock stood in Mr. Douglass' name, and was never to be changed on the books of the bank. At the same time that I had those securities with Paine, Webber & Co., I also had between $600 and $1,000 in cash, which was money that I had deposited with them. * * *

" In my transactions with Paine, Webber & Co. all moneys that I paid in or deposited were always deposited or paid in, in the office of Paine-Webber, to Mr. Dee. I also drew money from that office on some of my transactions. When I drew money, Mr. Dee, in the office here, gave me checks for it on the Houghton National Bank. In all my business that I did with the firm of Paine, Webber & Co., I never did any with them anywhere, except at this office. I never drew any money after taking their advice to buy Copper Range. I never had any to draw.    *    *    *

" Q. You were stating about an interview that you had with Mr. Paine about the last of October or the 1st of November. Did you state all that occurred between you and him at that time ?    *    *    *

"A. Well, no; I did not state all that occurred.    *    *    *

" Q. Well, can you give a complete and full account of

the interview? Was there anything else that passed between you? * * *

"A. Well, Mr. Paine— At the time, of course, as I say, I used all the persuasion possible to get him to return the stock to my account, and he said that he couldn't do it, and, as I said before, tried to get me to give him a note for it, and I told him about the bank stock that he held; that it did not belong to me; that it belonged to Mr. Douglass; that he could not hold it. I told him that I never had any notice that they contemplated the selling of the stock after the time when he had returned the stock that was sold to my account. I told him that I had had no notice to put up more money, and he said, as I said before, that the margin was exhausted, and that they had a right to sell the stock without giving notice. Mr. Paine told me at that time, also, that if I didn't give him a note that there was a way he could get it from some one else. He didn't mention selling the securities. I never received a written statement from them, because they knew in the office that Mr. Douglass didn't know about this transaction at all, and they never sent me any statement on that account. I used to go to the office nearly every day and get the information there. After Mr. Foster told me on the 24th of September that the stock was already sold I didn't learn that they claimed that it was sold on the 25th of September, until I received their statement that they made out for me in the Boston office. It was sent to Mr. Dee, and delivered by him to me. That statement was received some time in February or March, 1903. I had another interview with Mr. Paine after the interview in November or October, 1901. I can't state when it was, but I should say it was in the following spring. It was in the private office here in Houghton. I had been writing to Mr. Paine, imploring him to make some arrangements with me about this account, and I wrote him one letter asking him to put the stock back in my account, and I remember his writing to me saying that, of course, he couldn't do that, but that, if I could buy Copper Range stock and hold it, he thought that I would make up my loss. My second interview with him, above referred to, was almost a repetition of the first interview. It was in regard to the sale of the stock, and begging him to put it back in my account, and his refusing to do so. With reference to my statement about finally getting a statement of account, which was sent to Mr. Dee and delivered by

him to me, after I had been informed of the sale of the stock, I had tried by writing letters, by talking with Mr. Paine, and talking with Mr. Dee, to get some satisfactory arrangement about the sale of my stock, and I had never been able to do that. So I decided to bring suit for it, and I asked them for that statement. It was made in February, and I received it, I think, the 1st of March. It was about a month after I asked him for it before I received it. I asked Mr. Dee for it, and told him the purpose that I wished to use it for. I told him that I intended to do something about recovering my stock that they had sold. He said that the statement had to come from the Boston office. I repeatedly asked for it, and he said he hadn't received it. In response to my request I finally got the statement, which was delivered to me by Mr. Dee, here in Houghton. (Statement shown witness marked "Exhibit 5.") That is the statement. It is dated February 28, 1903. Mr. Dee telephoned me he had the statement, that he had received it from Boston, and I went to the office and got it; but it was some time about the 1st of March. It was about the 1st of February that I called on him and asked him to have it made out. (Statement received in evidence as marked without objection.) I kept no account myself, so that I could check this statement up to see whether it was correct or not. With reference to the item in that account, 'July 5, 1901, 100 Missouri Pacific rights received,' the holders of Missouri Pacific stock were given the right to purchase a certain amount of stock at a certain price, and they were called 'rights' on the stock. It was the right of the holders of the stock to purchase. Those rights were supposed to have been purchased and paid for and kept with the stock. As to the item in the statement of account, 'May 24th, 1,000 U. P. 4's received,' that was the Union Pacific bond that was held of mine. I put it up as collateral with them. With reference to the item of 'August 2d, 15 Missouri Pacific received,' that is the stock that I had a right to purchase, and that also went in as collateral with the rest. With reference to the item 'December 8, 1901, 25 National Bank Houghton, received,' that is the same 25 shares of bank stock that I suppose they received on August 17th. I did not have it after August 17th, and I have never had it since. With reference to the item on the opposite side of the account. 'September 30, 1,000 U. P. 4's delivered,' I never had more than one Union

Pacific or one lot of bonds of Union Pacific 4's, the $1,000
Union Pacific bond that was deposited as stated in the
account May 24th, and that was never delivered back to
me. With reference to the item in the statement of
the account near the bottom on the left-hand side,
' December 8th, 1,000 U. P. 4's received,' I never depos-
ited any 1,000 4's or any bonds or securities of any
kind, on December 8, 1901. I never deposited any secur-
ities of any kind with them after they had reported to me
that they had sold that Copper Range stock. I was told
it was put on there to make it show that I had paid
them that on account. This bond here, after I deposited
that in May, or whenever it was, I never received it back
or redeposited it. This statement gave me the first infor-
mation that I had that the sale was claimed to have been
made on the 25th of September, instead of the 24th of
September, or prior to that time. * * *

" I believe that they charge 10 points on railroad stocks,
and 20 points on copper stocks. I believe that was the rule
in Paine-Webber's office. I don't know it to be a fact, but I
have heard that anybody buying stocks in Paine-Webber's
office would have to put up a margin of $10 a share on rail-
road stocks, and $20 a share on copper stocks; but as to
my stocks there was no talk of margins. In all the time in-
tervening between my purchase of the 200 shares of Cop-
per Range and my information that it had been sold, I was
never asked for further margins but once, when I was asked
for margins on that account by Mr. Foster and refused to
put them up, and he sold 100 shares of the Copper Range
stock I was never asked for further margins on Copper
Range by Mr. Dee. To my knowledge and recollection I
didn't try between August 22 and September 25, 1901, to
get money in Houghton to put into Paine-Webber's office
upon my account. At the time of the sale of the 200 Cop-
per Range my margins in Paine-Webber's office were not
short to my knowledge, nor was I informed that they were.
I supposed that I had ample there to protect those stocks.
After the purchase of the Copper Range stock I went to
Buffalo on a pleasure trip. We left here on the 7th of Sep-
tember, 1901, and returned on the 23d of September.
While I was absent I did not make any arrangements with
any one here to protect my account with Paine, Webber &
Co. while I was gone. I supposed my account was amply
protected. I requested an acquaintance to write me about
the stock as to the prices of it, but I didn't ask a friend here

to protect my account with Paine-Webber while I was absent, nor did I send a telegram to this town to a friend here while I was absent to protect my account. I never took any statements from Paine-Webber's office. If they were sent there, they were left there. They were never delivered to me to take from the office. They would keep a statement there. I had requested Paine-Webber not to send any statements to me through the mail. They were to come to their office under cover for me. I saw statements so sent, I suppose two or three. I saw no statements there after sale of the stock. They claimed I owed them a balance after the sale of the stock. They had a statement, I think, in the office. I knew the amount that they claimed at the time. I think Mr. Dee kept the statement in the office. I knew the figures of the account. After my interview with Mr. Paine I wrote him a great many letters offering to make any kind of a settlement, if he would return the stock to my account, or if he would return the bank stock that he held as collateral."

The foregoing sufficiently shows the plaintiff's testimony regarding the contract, and, we think, warrants the statement that the evidence shows that the plaintiff sent an order to Paine, Webber & Co. to purchase this stock, and that she had a deposit of collateral with them, which secured them in making it, and that she knew that she was buying upon margin, and that the margin required was $20 per share on copper stocks. That the price of this stock fell, so that the margin was reduced below $20, does not appear to have been disputed, nor was the fact that defendants then sold some of the stock upon the stock exchange, without previous notice of time and place of sale. One of the legal questions discussed is whether the contract whereby the stock was purchased was a Michigan or Massachusetts contract, and upon its determination the necessity of notice of an intention to sell at auction, giving time and place of such sale, is said to depend; it being contended that, if a Massachusetts contract, the case must be governed by the law of Massachusetts, and that in such event the notice insisted upon by plaintiff's counsel was not necessary.

Two questions enter into this, viz.: (1) When and where were contract relations established? (2) Where did the parties contemplate performance of the contract to be made? The proofs show pretty clearly that Dee had not authority to make a contract obligating the defendants to purchase the Copper Range stock, and evidence offered of limitations upon his authority should not have been excluded. The record shows that the plaintiff knew the course of dealing; and, furthermore, there is no evidence tending to show a promise upon the part of Dee that his principal would buy Copper Range stock, or sell Elevated. He received and forwarded an order to his principals in Boston, with whom plaintiff already had dealings. It was subject to acceptance or rejection, and it was accepted and the purchase made. Such acceptance closed a contract which was theretofore a mere offer, and it occurred in Massachusetts. What was the contract thus made? Merely that defendants should purchase for the plaintiff 200 shares of a designated stock, if obtainable at a defined price, and that she should pay them the cost thereof and reasonable compensation; or, if it is inferable from the proof that it was to be purchased upon margin, that she should keep the margins good.

There can be no question that the contract was made in Massachusetts, and under the settled rule it should be interpreted by the rules of Massachusetts law, unless a clear contrary intent is apparent, or the place of performance affects the question. The rule that a contract is to be interpreted according to the law of the place where it is made is subject to the exception that—

" If by the terms or nature of the contract it appears that it was to be executed in another country, then the place of making the contract becomes immaterial, and the law of the place where the contract is to be performed governs, in determining the rights of the parties. If a contract is made in one State or country, and it is to be performed in another, it will be presumed that it was entered into with reference to the laws of the latter, and

those laws will be resorted to in ascertaining the validity, obligation, and effect of the contract." 1 Beach on Contracts, §§ 592, 606.

See, also, 9 Cyc. 582, subd. 3; *Paret* v. *Bryson*, Fed. Cas. No. 10,710; 2 Parsons on Contracts (9th Ed.), p. 734 et seq. That this contract was made in Massachusetts cannot be questioned. It does not appear from the terms of the instrument that the parties intended that the stock should be purchased in any other State, though there was no limitation upon defendants' right to purchase anywhere. In fact, it was purchased there. It must have been expected that it would be held there, if bought on margin, and plaintiff's collateral was held there.

There would probably be no escape from the conclusion that the Massachusetts rule should govern this case, but for the claim that payment was to be made in Michigan, if that can be said to affect the question. Ordinarily the acceptance of the order in Boston would entitle the acceptor to payment there. But it is evident that both parties knew the custom of the office in permitting payments to the agent in Houghton, and defendants could not avoid accountability for payments or deposits of collateral thus made. We think that it was intended that plaintiff should have such right, or the right to pay in Boston. We doubt defendants' right to refuse to receive payment in Boston. Payment is as much a part of the performance as the purchase of the stock. We have, then, a contract made in Massachusetts under which the purchase might be made anywhere, and payment might be made either in Michigan or Massachusetts, or, perhaps, anywhere, at plaintiff's option. 2 Parsons on Contracts (9th Ed.), p. 738, and cases cited. We do not intend to imply that an express provision that payment should be made in Houghton would justify the application of Michigan law to the interpretation of other provisions of the contract. We do not decide that question. Under this state of facts we cannot say that the terms of the contract show an intent to have the performance take place

elsewhere than in Massachusetts. This was not a written contract; but the testimony is not in conflict, and therefore we must pass upon the legal question of its interpretation.

This does not leave us the opportunity of questioning the correctness of the Massachusetts rule relating to the sale; for, as conceded by counsel, we must accept it as the law applicable to the contract of the parties, it being determined that the law of Massachusetts applies. We think it unnecessary to pass upon other questions, as they may not arise, should the cause be tried again.

The judgment is reversed, and a new trial ordered.

MOORE, C. J., and McALVAY, BLAIR, and OSTRANDER, JJ., concurred.