CONTINENTAL NATIONAL BANK OF CHICAGO, ILLINOIS,
*v.* FLEMING.

1. USURY—MORTGAGES—INTEREST—STATUTES.

Usury, consisting in the reservation of a greater rate of interest than the law permits (1 Comp. Laws, §§ 4857, 4858), is shown to have been unlawfully provided for by an agreement, separate from notes and mortgages upon defendant's property, and executed prior to said instruments stipulating for certain sums to be paid as salaries by the mortgagee to two persons to be named by the creditor as directors of the debtor corporation, the arrangement being intended as a substitute for a bonus of $6,000 originally proposed by the creditor.[1]

2. SAME.

The fact that the salaries were not actually paid is not controlling.

3. SAME—INTENT.

Where the creditor intends to secure more interest than the law authorizes, no disguise will avail to render the transaction lawful.

4. SAME.

Where the evidence showed that an arrangement to pay an usurious bonus upon a mortgage was entered into between the parties, the interest on the obligation was forfeited, and interest payments made by the mortgagor should be credited, in a foreclosure suit, upon the principal.

MOORE, C. J., and BROOKE, J., dissenting.

Appeal from Delta; Cooper, J., presiding. Submitted June 22, 1911. (Docket No. 8.) Decided February 10, 1912. Rehearing denied June 1, 1912.

Bill by the Continental National Bank of Chicago, Illinois, and Edward Hines Lumber Company against John C. Fleming, Cyrus A. Barker, the Garth Lumber & Shingle Company, and other defendants, for the foreclosure of a mortgage. From a decree for complainants,

[1] Usury as affecting receipt of commercial paper as payment, see note in 35 L. R. A. (N. S.) 72.

defendants the Garth Lumber & Shingle Company and Cyrus A. Barker appeal. Modified and affirmed.

*F. D. Mead* (*Newman, Northrup, Levinson & Becker* and *Chester E. Cleveland,* of counsel), for complainants.

*Arthur H. Ryall* and *G. R. Empson* for defendants Garth Lumber & Shingle Company and Cyrus A. Barker.

MOORE, C. J. (*dissenting*). The bill in this case was filed to foreclose a mortgage dated December 24, 1907, given by the Garth Lumber & Shingle Company, by C. A. Barker, its president, and running to the complainants above named, and the Bank of D. Hammel & Son and the first State Bank of Petoskey, to secure the payment of the following notes: One to the Bank of D. Hammel & Son for $5,500; one to the First State Bank of Petoskey for $8,500; one to the Continental National Bank of Chicago for $20,000; one to the Edward Hines Lumber Company for $30,000. All of the notes bore even date with the mortgage. There was a trial in open court which resulted in a decree in favor of the Continental National Bank, Edward Hines Lumber Company, and John C. Fleming, as assignee of the First State Bank of Petoskey, and the Bank of D. Hammel & Son for the amount due them respectively on the notes set up in the bill. The defendants C. A. Barker and the Garth Lumber & Shingle Company in their answer alleged that the transaction, especially with respect to the claims of the Continental National Bank and the Edward Hines Lumber Company, was tainted with usury. The defendant Garth Lumber & Shingle Company has prosecuted this appeal.

Counsel are agreed that the important question is whether the defense of usury was established.

In 1906 the Garth Lumber & Shingle Company was incorporated. Two men owned one share each of the stock. All the other shares of stock were owned by Cyrus A.

Barker. The three shareholders were directors. Mr. Barker was president, and for all practical purposes was the company. This company in 1906 made a contract with the Edward Hines Lumber Company to sell to it a large quantity of lumber to be manufactured during the sawing season of 1907. Within three months after this contract was made, the Hines Lumber Company made advancements to the Garth Lumber & Shingle Company reaching nearly, if not quite, $25,000. There were also other creditors of the Garth Lumber & Shingle Company, including the complainant bank. The Hines Lumber Company was not satisfied with the conduct of the business of the Garth Lumber & Shingle Company, and, after an examination by some of its experts, and various conferences, what is known as a working agreement was made November 14, 1906. A more extended reference will be made later to this agreement. After this agreement was made, the two lumber companies had very extensive dealings with each other. Finally the mortgage which it is sought to foreclose in this proceeding was made. On the same date the following paper was signed:

"CHICAGO, December 23, 1907.
"CYRUS A. BARKER, President.
"*Dear Sir:*
"In the mortgage this day given by you to our company and others upon lands of the Garth Lumber & Shingle Company in Delta and Alger counties, Michigan, the indebtedness to our company is stated to be $30,000.
"We now agree that if upon an accounting it is shown that there is a less amount due to our company we will indorse the differences between the $30,000 and the amount so actually due, as a credit upon the note as of its date.
"It is understood that certain of the lands covered by the mortgage have been heretofore conveyed, and that in such cases the land shall be released from the mortgage if they have been paid for in full.
"Very truly yours,
"EDWARD HINES LUMBER Co.
"By C. F. WIEHE, Sec'y.
"I agree to the above.
"C. A. BARKER."

It is conceded that there is nothing in the mortgage indicating usury; but that defense is based upon the working agreement to which reference has been made, and to what was said and done at the time it was executed. It therefore becomes important to refer more in detail to this agreement. It in the beginning recites the relations of the parties to each other. It then provides that:

"Now it is agreed between the parties hereto as follows:

"(1) The stockholders agree to at once indorse the certificates for the shares of the capital stock held by them respectively, and to transfer the same to Charles L. Allen, to be held by him for the purpose of managing and voting the same in accordance with the terms of a power of attorney, or trust agreement to be executed by said stockholders, when such deposit is made satisfactory to the attorneys of the creditors, such stock to be voted by Charles L. Allen at any corporate election for the election of Cyrus A. Barker, C. F. Wiehe, and George M. Reynolds as directors of said company during the continuance of this agreement. The object of said deposit and trust agreement is to more fully and effectually carry out the objects of this agreement primarily to give the creditors during the continuance of this agreement a majority of the board of directors of said company. O. F. Wiehe and George Reynolds above named represent said creditors, and Cyrus A. Barker represents said company. * * * Two of the present board shall at once successively resign and said C. F. Wiehe and George M. Reynolds shall be elected in their place.

"(2) The board of directors so chosen shall have full, absolute and uncontrolled right to conduct the business of said company, as it may see fit.   *   *   *

"(3) Cyrus A. Barker agrees to give his entire time and attention to the conduct of the business of the company during the term of this agreement, and in such manner as may be directed from time to time by the board of directors mentioned in paragraph 1 hereof. It is agreed that there shall be paid to the said Barker as compensation for such services, during the period of this agreement, the sum of two hundred and fifty dollars per month. He also agrees that, as president of the company, he will not incur any obligations on account of the company in excess

of the sum of five hundred dollars, without the consent of one of the other directors of said company, and that he will not make sales of any of the property of the company in excess of fifteen hundred dollars at any one time, without the consent of the Edward Hines Lumber Company.

"(4) Each of the other directors of said company elected as provided under the terms hereof, shall receive a salary at the rate of two thousand dollars per year, payable monthly, and a proper resolution shall be passed by the board of directors to that effect.

"(5) Subject to the conditions hereinafter stated, the creditors agree that the time for payment of claims of such creditors shall be, and the same are hereby extended until December 1, 1907, from the date hereof, with the privilege to the company, however, to prepay said obligations or to make payments on account thereof at any time during the extended period. Wherever the claims of creditors are represented by notes, said notes shall be surrendered and new notes shall be given for the extended period, or the notes now held shall be indorsed to show such extension."

It will not be necessary to set out the other provisions of the working agreement.

It is the claim of Mr. Barker and the Garth Lumber & Shingle Company that the provision in the contract that Mr. Reynolds and Mr. Wiehe should be paid a salary of $2,000 each was a mere cover to conceal usury. On the part of the complainants it is insisted that this provision was made in good faith, and as compensation for services which it was expected would actually be rendered. It is further insisted that Mr. Reynolds did in fact render some service for which he was paid $166.66, and that, as he regarded that as adequate compensation he declined to take any further pay. Mr. Wiehe insists that while he drew his salary monthly at the rate of $2,000 a year, he fully earned it. It is further insisted that not one dollar ever went to either of the complaining companies except for actual advances and the interest thereon which was agreed upon.

It is conceded that there is nothing upon the face of the working agreement that is illegal, but that the parol testi-

mony shows that the contention of Mr. Barker and the Garth Lumber & Shingle Company is true. The oral testimony is somewhat conflicting. It was taken for the most part in open court. The judge who saw the witnesses states in the decree as follows:

"That the transactions which resulted in the giving of said notes and mortgage were not usurious and that no illegal sums as compensation for the use of money represented and secured by the said notes and mortgage were included in or became a part of said mortgage."

It must not be forgotten that this is not a proceeding to enforce the provisions of the working agreement, but is a proceeding to foreclose a mortgage given long afterward, at which time it was agreed in writing:

"We now agree that if upon an accounting it is shown that there is a less amount due to our company we will indorse the differences between the $30,000, and the amount so actually due, as a credit upon the note as of its date."

We do not think it necessary to decide whose recollection as to what was said when the working agreement was made is most accurate. We attach great importance to what was actually done at that time and afterwards. These acts are entirely consistent with transactions that are within the law. Where the contract is not usurious upon its face, the party alleging it to be usurious has the burden of proof. We think he has not met that burden in this case. See *Green* v. *Grant*, 134 Mich. 462 (96 N. W. 583).

The other questions suggested by counsel have been examined, but do not call for discussion.

The decree should be affirmed, with costs.

BROOKE, J., concurred with MOORE, C. J.

STONE, J. I am unable to concur in the opinion of Mr. Justice MOORE in this case. While it is true, as he states, that this is not a proceeding to enforce the provisions of the so-called working agreement, yet it should be

borne in mind that the mortgage here being foreclosed was executed to secure the payment of the money which had been advanced and became due under the terms of the said working agreement; and the letter of the secretary of the Edward Hines Lumber Company, of December 23, 1907, referred to by Justice MOORE in speaking of the indebtedness of said Garth Company, had reference to indebtedness covered and contemplated by the working contract of November 14, 1906.

It is the claim of the defendant the Garth Lumber & Shingle Company that the evidence in this case discloses a transaction whereby the complainants were to receive not only 6 per cent. interest for all the money loaned by them to the appellant company, but also compelled the said appellant to pay $4,000 a year additional for the use of this money.

While the contract did not provide for the payment of this $4,000 directly to the complainants, it did provide for the payment thereof to men who held high offices in each of the complainant companies; and in each case it compelled the said defendant to pay money for services which were highly beneficial to the complainants, and which, it is fair to presume, would have been paid by them had the appellant been compelled to pay the amount agreed upon.   This is especially true in the case of Mr. Wiehe, as will later appear.

In the case of Mr. Reynolds, the president of the bank, the contract provided for the payment of $2,000 for services which were never performed to a person who it would appear knew nothing about that part of the contract until some months after the agreement had been made.

We have carefully read this record relating as well to the contract of July 2, 1906, as to the later contract. Operations had been carried on under the first contract until the Hines Lumber Company had advanced the aggregate sum of $25,000. The said company refused to make further advances for reasons which it stated. In

the meantime the Garth Lumber & Shingle Company had borrowed $20,000 from the complainant Continental National Bank of Chicago, of which Edward Hines was a director, and had incurred other indebtedness amounting to a large sum, as appears by this record.

Mr. Barker, representing the Garth Company, commenced negotiations with the Hines Company for the purpose of procuring additional advances. The situation was one in which the last-named company had a lien on all of the products which the Garth Company was to get out, and the property was so tied up that it was practically an impossibility for the Garth Company to borrow money from third parties. Negotiations were carried on during the month of October, 1906. Finally, about the 5th of November, 1906, a proposed contract was drawn up between the companies, which appears in this record. This proposed contract shows that the two companies were cooperating; and, while it called for further advances on the part of the Hines Company, it also provided for a mortgage by the Garth Company, to wit, covering its real estate in the State of Michigan, and also other property. Mr. Barker, representing the Garth Company, and acting under the advice of counsel, declined to sign this contract in behalf of his company. Further negotiations resulted in a meeting in the office of Mr. Allen, the attorney for the Hines Company, at Chicago, on November 13 or 14, 1906. This meeting continued for more than one day, and there were present Mr. Wiehe, the secretary of the Hines Company, Mr. Allen, Mr. Baker, and Mr. Mead, also representing said company, and Mr. Barker, Judge Cahill, and Mr. Henry, representing the Garth Company. It is significant that, with one exception, every person who was present at that meeting, and who testified on the trial of this case, says there was some talk about a bonus of some sort. Witnesses Wiehe, Baker, and Allen claim that the talk was concerning a bonus which was to be paid the Hines Company in case the Garth Company found somebody else to take the place of the former. It

is very clear from this record that the Hines Company was facing a fact that the Garth Company already owed it a large sum of money, and it was about to enter into a contract which, in order to be made profitable, would not only require the reorganization of the Garth Company, but would call for other large advances to a concern which they all claimed was then in a desperate condition. It should not be forgotten that Mr. Barker testified that the Hines Company had already suggested a liberal discount of their claim if he would get somebody else to take its place, and it does not seem reasonable that the Hines Company was to be given a bonus to release its interest in such an unfavorable contract. Yet we are asked to believe that the only talk with reference to the bonus was with reference to a release of this contract, which finally is provided for in the contract without any provision for the payment of any extra sum.

Upon this subject Mr. Barker testified as follows:

"*Q.* I wish you would tell the court what took place in Mr. Allen's office, in regard to that matter, at the time this contract was entered into which is dated November 14, 1906.

"*A.* My recollection is that the day before Mr. Henry had had a conference with Mr. Allen, perhaps one or two conferences, and were probably—I am not positive, but probably met at Mr. Allen's office on the day before this contract was drawn up, and talked matters over without any result at all, and we were all to meet there on the following day when this working contract was finally drawn up; and there were present at that meeting Mr. Edward Hines, Mr. Wiehe, I think Mr. Hayes, the accountant of the company, Mr. Baker, Mr. Allen, Mr. Henry, Judge Cahill, and myself. And after we had all entered and sat down, Mr. Hines—and my remembrance is positive—stated that, before going on at all with any proceeding, he wanted it understood that he wanted a bonus of $6,000 before anything else was done. Judge Cahill got up and said that under the laws of Michigan he thought that would be declared usury, and they run the chance of not only losing the bonus, but the interest as well. There was nothing said for a minute or two, and finally, as

I remember, Mr. Wiehe gets up, and Mr. Allen and Judge Cahill and myself, and we leave the room and go into the next room, which I suppose was their waiting room or library, and stands up there talking about usury. And then Mr. Allen and Mr. Cahill confer a minute or two and they say they will take $4,000 instead of $6,000, and will put it in the way of salaries to the directors, $2,000 to each of them. That is consented to on my part, believing it the best to be done, and we go back then and they commence drawing up this contract, which was finally drawn up and a provision made for the resignation of these old directors, and the Illinois new ones in their place.

"*Q.* And this contract was all worked out after that time?

"*A.* Yes, sir; that is my sworn statement of that meeting.

"*Q.* Why did you consent to that sort of an arrangement down there?

"*Mr. Cleveland:* That is objected to as calling for his conclusion, and as immaterial.

"*A.* As matter of compulsion. I had to do it or quit. These men were in the woods working, and there was only one thing to do.

"*Mr. Ryall:* *Q.* Had you made some efforts to interest some other parties?

"*A.* Mr. Hines had made a statement once or twice that if I could get some one else to take his place in the contract—I asked the privilege, I thought I might be able to—he would give me $10,000; he would throw off $10,000 off his account if I succeeded in getting any one else to assume that contract and pay him back his money. And I saw one or two parties and found out I could do nothing with any of them upon any contract of that kind which Edward Hines had anything to do with. I couldn't do anything with it, and I did nothing, accomplished nothing.

"*Q.* You made some efforts?

"*A.* I made some efforts; yes, sir.

"*Q.* Mr. Wiehe testified yesterday that there was some talk about fixing it in this way, that you were to pay a bonus if at some later day you found somebody to take it off their hands?

"*A.* That is absolutely incorrect. Instead of that, it was the other way. I was to get a discount of $10,000 on my indebtedness to the Hines Lumber Company, provided I could get some one else to take that contract and pay

them back their money. No such thing, not one word or syllable as Mr. Wiehe testified here."

It is true that it is sought to weaken the testimony of Mr. Barker because he states that it was Mr. Hines who demanded the bonus at this meeting. He afterwards corrected this, and stated that it was Mr. Wiehe who made such demand. From the fact that there had been negotiations between Mr. Barker and Mr. Hines during the month of October, and a part of November, relating to this business, it is not strange that there may have been some confusion in Mr. Barker's mind upon that subject. But Mr. Barker's testimony does not stand uncorroborated upon this subject. Mr. Henry, who had been associated with Mr. Barker in business, and who also represented the Garth Company in the negotiations leading up to the meeting of November 14th, testified fully upon this subject:

"*Q.* You may state whether or not at this conference on the 13th anything was said by Mr. Wiehe or in the presence of Mr. Wiehe about the bonus to be paid to the Hines Lumber Company by the Garth Lumber & Shingle Company. (This was objected to by Mr. Cleveland as leading, suggestive, and as calling for the conclusion of a witness, and as incompetent, irrelevant, and immaterial.)

"*A.* There was. I cannot recall now who made the statement. My recollection is that a talk was had, possibly with Mr. Allen and Mr. Barker and Mr. Wiehe. They were on one side of the room, and they turned around, and some one stated, I don't know who, that they wanted a bonus; that the Edward Hines Lumber Company wanted a bonus in the transaction as a part of this proposed arrangement for the control of that company. I would not say positively who made the statement, but I think it was—I think it came from, my recollection is that it came from—Mr. Barker; that is, he turned around in the conversation where it was held, but in the presence of Mr. Wiehe—that is my recollection, it is a long while ago—but he turned around and he stated that they wanted a bonus. Then there was some conversation in reference to the matter in the presence of Mr. Mead, Judge Cahill,

Mr. Allen, Mr. Wiehe, and myself and these other two gentlemen.

"*Q.* What, if anything, was said by either of them? (That was objected to as incompetent, irrelevant, and immaterial as calling for the conclusion of a witness.)

"*A.* Judge Cahill stated that he thought that a matter of that kind would be in contravention of the laws of Michigan.

"*Q.* Did he say on what ground? (This was objected to by Mr. Cleveland as incompetent, irrelevant, and immaterial.)

"*A.* I think he said that in his judgment it would be usury.

"*Q.* What further was done about it, if anything? (This was objected to by Mr. Cleveland as incompetent, irrelevant, and immaterial.)

"*A.* Mr. Barker, Judge Cahill, and Mr. Wiehe went out of the room. I do not know where. They went out and were gone a little while. I was not with them.

"*Q.* What happened when they came back, if anything? (This was objected to as incompetent, irrelevant, and immaterial.)

"*A.* Somebody stated they had decided to put it in the form of salaries to the board of directors. I cannot state definitely who it was. It was one of the four that went out of the room, and all seemed to assent from what they said.

"*Q.* Do you know whether as the result of that talk and conversation this provision in the contract relative to the payment of salaries to the two directors of the company was inserted in the contract? (This was objected to by Mr. Cleveland as a conclusion of a witness as incompetent, irrelevant, and immaterial.)

"*A.* It is my recollection that a draft of the contract had been prepared the night before. Judge Cahill came here, and I think it contained no clause of that kind. He examined the paper. Judge Cahill, Mr. Barker, and I went to lunch the day Judge Cahill was here and examined the paper, and my recollection is that when we went back in the afternoon, this suggestion regarding the matter came up. The conference was had in the other room by the four gentlemen, and when they came back, a new draft of the contract was made or it was prepared by Mr. Allen, and Judge Cahill went home, and the contract was signed between us the following day. I think Judge

Cahill left an assignment of his stock and tendered his resignation as a member of the board, and that afternoon Mr. Wiehe was elected a member of the board in place of Judge Cahill. *  *  *

"*Q.* Mr. Henry, at the time of this talk about this bonus which you refer to, was any particular amount mentioned ?

"*A.* I could not say as to that. I have an impression, but I have no distinct recollection as to the amount ?

"*Q.* What is your impression ?

"*A.* My impression is that it was $4,000.

" *Mr. Cleveland:* I object to the question. It is incompetent and immaterial.

" *The Witness:* I will say that the conversation was not directed to me; it was a conversation that I heard.

" *Mr. Ryall:* You mean the $4,000 ?

"*A.* Yes, sir."

The testimony of Mr. Barker and Mr. Henry is substantiated in all of its important details by that of Judge Cahill, who was called to Chicago to assist Mr. Henry in the preparation of this contract, and as attorney for the Garth Company. He testified as follows:

"*Q.* Now at that time you may state whether there was any talk relative to a bonus being given by anybody to the Garth—I mean by the Garth Lumber & Shingle Company to anybody.

" *Mr. Mead:* I object to that as immaterial and incompetent.

"*A.* Some one, whom I understood to be representing the Hines Lumber Company, said that there wouldn't be any new arrangement or any more money advanced unless there was some provision, some bonus arranged for, over and above the interest that they had been getting; and I at once said that any exaction of a bonus would be usurious, in my judgment; and then some one, I am not sure who it was, but it seems to me it was Mr. Allen, spoke up and said, ' Well, that has been taken care of by agreeing to pay the directors a salary.' And the bonus, the amount that was first talked about, was $6,000. Mr. Barker said he wouldn't pay $6,000; that it was extortionate, and he wouldn't pay it. Then it was suggested—my recollection is that Mr. Allen and myself and Mr. Henry retired and considered what sum he would be willing to give, or

what sum he ought to give, what sum should be given. I know certainly that I was one of them that retired, and I am quite sure that Mr. Allen was another; just who the third one was I am not certain. And after talking the matter over we agreed upon $4,000. I said I would consent to that if Mr. Barker would approve of it, but I must first submit it to him. I think Mr. Allen said similarly he wanted to submit it to Mr. Wiehe, or whoever else was there; he wanted to submit it to his people. So I submitted it to Mr. Barker, and he finally consented to it.

"*Q.* This contract of November 14th was signed up at that time?

"*A.* I can't be sure about that. I wasn't concerned with that. I was called over there, not to look after the details of this contract, but simply to consult with Mr. Barker as to whether he had better make any contract at all or not.

"*Q.* You may state whether or not the amount which was inserted by way of salary was the amount agreed upon by way of bonus.

"*A.* That is the way I understood it. It was suggested in the manner I have stated; anybody else can draw as good an inference about it as I can."

Upon cross-examination Judge Cahill testified:

"*Q.* At that time don't you recall, Judge Cahill, that Mr. Barker thought that perhaps in the near future he might be able to terminate that contract to his advantage?

"*A.* Yes, I think something of that kind was said.

"*Q.* And at that time is it or not true that Mr. Wiehe said that if he had a right to terminate the contract, and should terminate the contract, then the Edward Hines Lumber Company ought to have a bonus?

"*A.* I don't think so. I think I said he would give them a certain length of time—20 or 30 days or less, some length of time, anyway. If, within that time, he would pay what was coming to them, they would be glad to have him do it.

"*Q.* Are you willing to say that Mr. Wiehe didn't say, or that some one didn't say, in case Mr. Barker would terminate the contract by which the Edward Hines Lumber Company was to have the product, then that they ought to have a bonus?

"*A.* No, sir; I think there is a clause, now that you call my attention to it—I think there is a clause in the

mortgage which says, if the money was paid in a certain time, they might or they would surrender the contract.

"*Q.* Yes, that is true. But don't you remember that the question of money came up; that if, after making the arrangement, and making the advances, the contract should be terminated, and they would not get the lumber, then they ought to have some compensation for drawing it up?

"*A.* I didn't hear that, I am sure. That is not what made me think it was usurious, because that wouldn't be usury at all.

"*Q.* You don't know what transactions these gentlemen had had before; you had not been at their negotiations before?

"*A.* No.

"*Q.* Were you there more than this one day?

"*A.* That is all, just that one occasion.

"*Q.* At this time the idea of paying a bonus was never carried out; that is, it never was put in the contract?

"*A.* The idea of who paying a bonus?

"*Q.* Anybody paying a bonus?

"*A.* That depends on how you look at it. If you want my opinion on it—you do not want my opinion, I suppose?

"*Q.* No. You understood, did you not, at the time, that the creditors claimed at least that Mr. Barker had not properly managed the company. They made that claim, didn't they?

"*A.* You mean from the time he had been running his—

"*Q.* Yes, that he hadn't made a success of running the company.

"*A.* I don't know that I knew whether he was running the company or whether they had been running it."

Mr. Mead himself testified that it was his recollection that at the time of this talk no provision had been yet made in regard to salaries. It is true that it is claimed by the complainants that the introduction of this salary question may be explained upon the theory that Mr. Barker had asked for a salary, and thereafter the other directors demanded it. But it seems more reasonable to say that the testimony on behalf of the defendants gives the correct version, when the witnesses testify that a bonus of $6,000 had been demanded, which sum was afterwards reduced to $4,000, and that then Mr. Allen

announced that it had been taken care of in the shape of salaries.

We are constrained to say that, in our opinion, the clear weight of evidence shows that a bonus to be paid to the Hines Company as a consideration for its continuing to finance the Garth Company was demanded, and that the financial condition and other circumstances surrounding the parties at that time were such that the Garth Company was in a position where it might easily have been made the subject of such a demand, and that the question of this amounting to usury was discussed at this meeting, and that it was practically admitted by the attorneys present that the payment of a bonus in that form would amount to usury, and that the same purpose was attempted to be accomplished by providing for paying the amount in the form of salaries. An examination of the working contract on its face appears to be an agreement between Mr. Barker, one of the defendants, John A. Henry, and C. F. Wiehe, owners of the entire capital stock of the Garth Company, as parties of the first part (therein called "stockholders"); certain creditors of said company, as parties of the second part (the two complainants, Continental National Bank of Chicago, and Hines Lumber Company, called "creditors"); the Garth Lumber Company, as party of the third part; and Barker, individually, as party of the fourth part. It first provided for the stockholders to turn over all of their stock to Charles Allen, to be held by him in trust in accordance with a certain trust agreement, which appears in the record, and provided, in short, for Allen to vote the stock at all meetings in favor of Barker, Wiehe, and Reynolds, as directors of the Garth Company. It was further provided that the object of the trust agreement was to give the creditors a majority on the board of directors; and it specifically provided that "C. F. Wiehe and George Reynolds, above named, represent said creditors, and Cyrus A. Barker represents said company." The board of directors was given full, absolute, and uncontrolled right

to conduct the business of the company as long as the agreement was enforced. It then provided that Mr. Barker should receive $250 per month, and that he was to give his entire time and attention to the conduct of the business of the company. It then provided that each of the other directors, viz., C. F. Wiehe and G. M. Reynolds, should receive a salary at the rate of $2,000 per year, payable monthly.

We have referred to the provision that the Hines Company gave the Garth Company and Barker each a right to pay within 15 days from the date of the instrument all advances which might have been made under the agreement of July 2, 1906, and upon making such payments, with interest at 6 per cent. per annum from the date of each advance, then the agreement of July 2, 1906, should be canceled and terminated, and that the Garth Company and Barker should each be under no liability or obligation whatever to the Hines Company by reason of said contract. In this connection no reference is made to any bonus. Had a reasonable amount been inserted for such privilege, it probably would not have been usurious.

Pursuant to the provisions of this contract, the stock was all transferred to Mr. Allen, and he proceeded to cast it for the election of Messrs. Barker, Reynolds, and Wiehe as directors of the company. At this time Mr. Reynolds was the president of the Continental National Bank, complainant, and testified as follows:

" I am told that I was at one time a director of the Garth Lumber & Shingle Company. I do not think I was ever present at any meeting where I was elected a director of that company. I think, as I recall it, I attended one meeting of the directors of the Garth Lumber & Shingle Company. I think I received compensation as a director. My recollection is that I received at one time $150. I am speaking from memory. The bank did not get any of that. No part of it was ever paid to the bank. I was told some months afterwards of the resolution or agreement to the effect that I was to have $2,000 a year for acting as a director."

He then refers to a certain letter received by him from an attorney in Michigan in which it was claimed that his bank had been receiving usurious interest; that he wrote denying this charge; that he then had the bank's attorney take up the question with Mr. Wiehe, who informed him that a resolution had been passed to the effect that the directors of that company were to have $2,000 a year; and that checks had been issued from time to time running to him (Reynolds) as director, but that he had never received them at all.   He then adds:

"In fact, I told Mr. Wiehe at that time that I had not performed any services and did not think I was entitled to them, and that I would not want to take them.   I do not remember.   He told me the amonnt, but I cannot undertake to tell what it was; it was some months afterwards at any rate.   I did not receive personally anything on account of this salary of $2,000 a year outside of the $150."

He then stated that the said bank did not receive it, and that it has never received anything on the note in the way of usury, nor anything in excess of 6 per cent., provided for in the note; that he was a director of the Continental National Bank and president at the time the loan was made.   And he stated, on cross-examination, that he could not tell what business was transacted at the meeting of the Garth Company which he attended.

It appears from the record that one check for $1,833.33 had been drawn in Mr Reynolds' favor and certified by his bank, and had never been delivered to him.   This check bears date November 25, 1907.   This is the same check which is mentioned in the decree, and which was credited to the defendants, although charged against them by the complainants in their bill of complaint, and in the account which they produced on the hearing of the case.

It is the claim of the defendants that the foregoing facts bring the case within the doctrine of *Anderson* v. *Smith*, 108 Mich. 69 (65 N. W. 615).

The condition under which the money was paid to Wiehe is somewhat different.   He was secretary of the

170 MICH.—41.

Edward Hines Lumber Company, and, by authority of the working agreement, became secretary and treasurer of the Garth Company. He continued to work for the Hines Company, and his salary as secretary of that company continued and was not decreased. The Hines Company, in this record, claims to be the largest lumber company in the world, and his services as secretary of that company were very extensive and onerous. It would seem from his testimony that the services which Mr. Wiehe claims to have performed in connection with said $2,000 salary were in the interest of, and increased, the security of the complainants' advances, and that the great mass of supervisory work consisted in looking after the transactions between the Garth Company and the Hines Company.

Bearing in mind that both Mr. Wiehe and Mr. Reynolds were interested as officers with the complainant companies, both of which were creditors, and that they were placed upon the board of directors of the Garth Company to represent the creditors, does it meet the question presented by the defendants to say that neither of the complainants obtained any direct benefit from the payment of these salaries? Without conceding that such was the fact, is not the more important question to be considered whether the Garth Company was not compelled to pay more than the legal rate of interest on its indebtedness in order to consummate said working contract, to secure the payment and performance of which this mortgage was executed?

We think that the claim of the defendants upon this question is well within the authorities. We shall not stop to analyze them, but refer to them generally hereafter. The language of our statute is important in this connection. Section 4857, 2 Comp. Laws, is as follows:

"No bond, bill, note, contract or assurance, made or given for or upon a consideration or contract, whereby or whereon a greater rate of interest has been, directly or indirectly, reserved, taken or received, than is allowed by law, shall be thereby rendered void; but in any action

brought by any person on such usurious contract or assurance, except as is provided in the following section, if it shall appear that a greater rate of interest has been, directly or indirectly, reserved, taken or received, than is allowed by law, the defendant shall not be compelled to pay any interest thereon.

" SEC. 4858. Whenever it shall satisfactorily appear by the admission of the defendant, or by proof that any bond, bill, note, assurance, pledge, conveyance, contract, security, or any evidence of debt has been taken or received in violation of this act, the court shall declare the interest thereon to be void."

It is well that we bear in mind that by this statute usury consists in the reservation of a greater rate of interest, directly or indirectly, than is provided by law, as well as in the taking or receiving; and it is not necessary that unlawful interest be actually paid or received in order to constitute usury.

It is also the rule in this State that, if the transactions on account of which the indebtedness was incurred were tainted with usury, its effect cannot be avoided by taking other paper or security for the indebtedness, including the usurious charge. *Smith* v. *Stoddard,* 10 Mich. 148 (81 Am. Dec. 778); *Gardner* v. *Matteson,* 38 Mich. 200. See note to *Rorer* v. *Building & Loan Ass'n,* 2 Am. & Eng. Ann. Cas. 912.

Much depends upon the intention of the lender in such a case. *Fretz* v. *Murray,* 118 Mich. 302 (76 N. W. 495); *Estey* v. *Building & Loan Ass'n,* 131 Mich. 502 (91 N. W. 753); *Green* v. *Grant,* 134 Mich. 462 (96 N. W. 583); *George N. Fletcher & Sons* v. *Alpena Circuit Judge,* 136 Mich. 511 (99 N. W. 748).

It is also claimed by complainants that to be usurious the payment must be exacted by the lender for the use of money, and not on account of some other consideration.

In *Rosen* v. *Rosen,* 159 Mich., at page 75 (123 N. W. 560, 134 Am. St. Rep. 712), Justice McALVAY, in speaking for the court, said:

"The authorities in those States where the statutes like

ours include all contracts and assurances are harmonious in holding that every written agreement to pay interest in excess of the legal rate, however well the unlawful interest may be disguised, is in violation of law and usurious "—citing cases.

See, also, *Houghteliny* v. *Lumber Co.*, 165 Mich. 498 (131 N. W. 109); *France* v. *Munro*, 138 Iowa, 1 (115 N. W. 577, 19 L. R. A. [N. S.] 391); *Barry* v. *Paranto*, 97 Minn. 265 (106 N. W. 911, 7 Am. & Eng. Ann. Cas. 984, and note).

No disguise of language can avail for covering up usury, or glossing over a usurious contract. While the courts hold that a fair and reasonable charge may be made by the lender for services actually rendered, nevertheless they have said:

"But because charges of this character are often resorted to as a plausible pretext for obtaining illegal interest, and are easily made at a time when the borrower is at a disadvantage, a very strict degree of proof is required of their reasonableness, and of the *bona fides* of the lender, when challenged as usurious." 27 Am. & Eng. Enc. Law (1st Ed.), p. 1013.

See, also, *Pope* v. *Marshall*, 78 Ga. 635 (4 S. E. 116); *Payne* v. *Newcomb*, 100 Ill. 611 (39 Am. Rep. 69); *Ammondson* v. *Ryan*, 111 Ill. 506; 29 Am. & Eng. Enc. Law (2d Ed.), pp. 461–463, and cases there cited.

We conclude that the decree should be modified in accordance with the views here expressed, and the case should be remanded with directions to the lower court to take an accounting and ascertain the amount of interest which has been paid by or charged to the Garth Company by complainants since the making of the contract of November 14, 1906, which interest should be deducted from the amount of the decree against it, in the lower court.

The appealing defendants should recover their costs in this court.

STEERE, MCALVAY, BLAIR, and OSTRANDER, JJ., concurred with STONE, J. BIRD, J., did not sit.