BARRAS *v.* YOUNGS.

1. COMPROMISE AND SETTLEMENT—EVIDENCE—RATIFICATION.

Evidence tending to show that the complainant and de-fendant, who had been jointly engaged in investments in Nevada property, undertook to market certain prop-erty of the complainant in Michigan and to divide the same between them, that they later made and agreed upon terms adjusting all differences between them, that upon a subsequent date a further settlement of the affairs was made and that complainant signed a receipt for a part payment upon such settlement: *held,* suffi-cient to establish the existence of a compromise agree-ment between the parties.

2. SAME—FRAUD—INTEREST.

It was not such fraud as to invalidate an alleged com-promise of conflicting claims between the parties that defendant had sold certain lots upon contract from prop-erty that was jointly owned by the parties, but that he did not disclose that such contracts bore interest and he had been collecting the same, where complainant was a shrewd business man and a trained lawyer and had had considerable experience in realty matters.

3. USURY—TRUSTS—SITUS—INTENT.

The place where the terms of the contract are agreed upon determines the place whose laws shall control in in-terpreting them; so that where complainant, a resident of Michigan, was temporarily residing in Nevada and proposed to a resident of Michigan to execute to the latter a trust deed to secure such advancements as might be made, and the defendant prepared a deed of trust relating to property that was situated in the State of Michigan and forwarded it to Nevada to be executed in conformity with the request of the other party, the con-tract must be held to have been executed in Michigan and subject to the rules of the law of this State.

4. SAME—CONFLICT OF LAWS—PRESUMPTIONS.

If a contract is made in one State or country to be per-formed in another it will be presumed to have been

entered into with reference to the laws of the State in which it is to be performed and they will be resorted to in determining the validity, obligation and effect of the agreement.

5. USURY—INTEREST—PAYMENT—SERVICES.

Where complainant proposed to execute a trust deed to defendant to secure advances which the latter might make to redeem ·certain lands from a foreclosure sale and to secure such other expenditures as might be made in selling the property, and where an important part of the consideration was services to be performed by the trustee in effecting a redemption and securing a clear title and paying taxes and in performing other functions connected with the development of the property, a provision that the trustee should have one-half of the interest of the complainant, in addition to interest on the investment, was not usurious but amounted to a valid payment for services to be rendered.

6. SAME.

Only when services are employed as a cloak to conceal intended usury will the relative value of services, compensation, etc., be inquired into.

7. EQUITY—CROSS-BILL—PLEADING—AFFIRMATIVE RELIEF.

Unless a defendant asks affirmative relief by his pleading, in the form of a cross-bill or answer in the nature of a cross-bill, the court will refuse to grant any equitable remedy in his favor.

8. TRUSTS—COMPENSATION OF TRUSTEE—EXPENSES.

The provision of a trust deed that "all expenses and incidental charges of the trustee, incurred by the trustee in discharge of the trust hereby created, shall be deducted from the income," etc., clearly refers to necessary disbursements, and not to compensation for services rendered by the trustee; no part of the funds in his hands could be retained pursuant to such language as compensation for work done by him.

Appeal from Iron; Flannigan, J. Submitted November 13, 1914. (Docket No. 31.) Decided April 19, 1915. Rehearing denied July 23, 1915.

Bill by Alpha C. Barras against George W. Youngs

185 Mich.—32.

for an accounting and other relief. From a decree for defendant, complainant appeals. Modified and affirmed.

*I. W. Byers* (*C. C. Ritze, L. A. Lyon,* and *A. H. Ryall,* of counsel), for complainant.

*M. J. Sherwood,* for defendant.

KUHN, J. The bill of complaint prays for an accounting to the beneficiary from his trustee. The complainant, a resident of Escanaba, had formerly resided at Iron River in this State, which latter place he left in 1906 and went to Nevada, where he remained about four years. He is a graduate of the law department of the University of Michigan, and had practiced law for a short time, but since his graduation his business has been mainly real estate. He was the owner of an undivided quarter interest in the N. ½ of the N. E. ¼, the S. E. ¼ of the S. W. ¼, and the S. W. ¼ of the S. E. ¼ of section 26, and the N. E. ¼ of section 36, township 43 north, of range 35 west, Iron county, Mich. The S. E. ¼ of the S. W. ¼ and the S. W. ¼ of the S. E. ¼ of section 26 was known as "Weimer's Field." The complainant's cotenants in this property were his mother, Frances E. Barras, and his uncle by marriage, John D. Ross, who together owned the remaining undivided three-fourths interest in the land. Some time prior to 1907 the complainant had given his uncle, John D. Ross, a mortgage on his interest in all these lands. Some friction having arisen between the complainant and his mother and Mr. Ross, arising out of certain business dealings, the uncle started foreclosure on his mortgage, and the complainant's interest in the land was sold on December 14, 1907, to Mr. Ross. The amount required to redeem approximated $1,500, and the time of redemption expired on June 14, 1908.

It appears that the complainant and defendant had met and become acquainted at Iron River, and this acquaintance had ripened into a warm friendship, and while the complainant was in Nevada he and the defendant became jointly interested in the exploration of certain mineral lands in that State, it having been arranged that the complainant was to look after the business on the ground and the defendant to furnish the necessary money to carry on the enterprise. It was while in Nevada that the complainant first learned of the foreclosure of this mortgage by his uncle from some source. A letter written to him by the defendant about December 21, 1907, also informed him of this fact. Upon learning of the foreclosure he immediately wrote Mr. Ross, requesting him to cancel the foreclosure and to accept as a substitute a trust deed of the property under which he would be authorized to sell at discretion the complainant's interest in the lots of a proposed plat of Weimer Field and retain the proceeds until the complainant's indebtedness to him, principal and interest, was fully paid, it appearing that in 1903 the complainant and his cotenants had caused about 50 acres of Weimer's Field to be surveyed and staked out into lots and a plat thereof to be made, but the same had never been recorded. Mr. Ross did not reply to the letter written by the complainant, and on January 1, 1908, the complainant wrote the defendant of his offer to Mr. Ross and of his failure to secure an extension and of his fear that Ross was trying to get his interest in the property, and that unless complainant heard from defendant by February 1st, he thought he would sell to a building company at Iron River, which had offered him $1,500 for his interest in Weimer's Field some time previous to the foreclosure sale. In reply, the defendant recommended the sale to the building company, as the complainant would be thus enabled to

pay his debt and save his remaining interest, and also offered to raise the money and take up the mortgage and thereby assist the complainant. The defendant also, in the meantime, endeavored to find a purchaser for Weimer's Field at a better price than was offered by the building company, and wrote the complainant of a prospect of selling to one Swanson at $2,500. This sale the complainant was willing to make, but Swanson finally decided to invest his money elsewhere. On February 4, 1908, the defendant wrote a letter to the complainant, in which he suggested, "not to let his property go by default," and also "if we have a little time and it has to be done, we will put the money in and save it. You and your wife could make a trust deed to me, and I am sure if we had thirty days time we could pay it." To this the complainant replied under date of February 9, 1908, as follows:

"Now in regard to the Weimer and your suggestion of taking up the mortgage Mr. Ross holds and my giving a trust deed. This is in exact accordance with what I would wish, but did not wish to impose on your generosity in this regard, and therefore wrote Mr. Byers on the first of this month that I had decided to sell my interest and I then asked him to procure better terms than the fifteen hundred dollars previously offered. I knew this was giving the property away even at the price of lots at the time I left Iron River; your letter, however, gave me a good insight into the matter, for if all the lots are sold in the original plat of Iron River, of course our addition will sell rapidly, and if the price of the original plat lots, which are only 30x120 ft., sell for three hundred dollars, ours ought to sell for the same money when we give them almost twice the ground; our lots being 50x140 ft. If I remember right, I figured when I laid out the Weimer that the lots included in the plat at two hundred dollars for the lots in the first tier of blocks facing the road, and one hundred and fifty dollars for the balance of the lots, would, if all were sold, amount to about thirty thou-

sand dollars. This being only a little over one-half of the Weimer field. However, I gave Mr. Coe a blueprint of the plat, which you can get from him and figure out yourself.

"The amount of Mr. Ross' mortgage as foreclosed last December, including Holmes title which he purchased, was fourteen hundred and one dollar and some cents. I suppose interest and the expenses extra would bring the amount up close to fifteen hundred dollars, but if you advanced this money to me, there is to offset this in the neighborhood of five hundred dollars due me on my interest on the sale of lots, which I made when I was in Iron River, besides the interest since that time.

"As you are better acquainted with the risks and advantages of this real estate in Iron River, than I am, I will submit this proposition to you, for if you inconvenience yourself to put up money for me, Cap, I want you to make something good out of it.

"Therefore, if you are willing to take your security on the Weimer and the pay from the sale of the lots, I to give you a trust deed for same, and when the money you have advanced and the interest thereon is paid up from the sale of the lots, I will then give you a deed for one-half of my interest then remaining in the whole Weimer eighty; that is, an undivided one-eighth interest. This said agreement can be embodied in the trust deed. In the meantime, when the lots are put on the market, I see no reason why you, Frank, or Dave could not get the agency for the same, as the commission is ten per cent., and would amount to quite a bit on a lively market. As I figure it, it would only need the sale of fifteen or twenty lots more to fully pay up fifteen hundred dollars; that is, with the money now due on my interest from previous sales, and we could then whack between us the rest of any sales which would be due on this quarter interest, which would be quite a chunk in itself, you can, however, figure this out better from the blueprint at Coe's than I can try to explain on paper. I have until the first of June to redeem, so we have plenty of time. If this proposition meets with your approval, have trust deed made out and my wife and I will sign same. If not, fix it up to suit yourself, for I know it will be all right anyway."

The offer contained in this letter was not accepted in the exact terms proposed, but instead the defendant forwarded to complainant a draft of a trust deed, accompanied by a letter, and with reference to the sale of the property for $2,500 he wrote:

"I don't think you read my letter right. Charlie Swanson did not say he would take the property at $2,500, but wanted me to find out if you would sell. At present I don't think he would buy, as he has arranged to loan his money to Krom."

On March 1, 1908, the complainant wrote the defendant:

"The trust deed has arrived and is O. K. Will take the first stage out to Mina, have my signature acknowledged, and then send to my wife for her signature. I wrote you the other day that I would rather take the offer of Swanson as I was anxious to get back for a visit. But I know we will make the most money through this trust deed, as you are on the ground to see that matters go according to Hoyle, and am pleased to have the matter settled, and am very grateful indeed for your kindness, and hope we will both make a little chunk of money out of the transaction."

A trust deed was prepared by the defendant, and was executed by the complainant on March 4, 1908, and by his wife on the 14th day of the same month. The deed gives the defendant a very broad power in connection with the sale and disposition of the property, and provided for the repayment of the moneys advanced by him to redeem from said mortgage sale, together with interest at the rate of 6 per cent. per annum. The fifth and sixth paragraphs of the deed further provide:

"*Fifth.* That after the repayment of such redemption money with the interest thereon and the said taxes, the said trustee, and his successors, shall reconvey to the said Alpha C. Barras an undivided one-half of the undivided one-fourth of all that part of the said southeast quarter of the southwest quarter and south-

west quarter of the southeast quarter of said section twenty-six (26), and all of the undivided one-fourth of said north half of the northeast quarter of said section twenty-six (26), and the northeast quarter of said section thirty-six (36); and the said Alpha C. Barras and Lillian Barras, his wife, shall convey to the said George W. Youngs, his heirs or assigns, the remaining undivided one-half of the undivided one-fourth of the said southeast quarter of the southwest quarter and southwest quarter of the southeast quarter of said section twenty-six (26) remaining unsold.

"*Sixth.* That all the expenses and incidental charges of the trustee, incurred by said trustee in the discharge of the trust hereby created, shall be deducted from the income from the sale or leasing of the said southeast quarter of southwest quarter and southwest quarter of the southeast quarter of section twenty-six (26) township 43 north of range 35 west."

Some six or seven of the lots of the proposed plat had been sold, but in the spring of 1906 Mr. Ross declined to join in the sale of any of the other lots until his mortgage was paid, which attitude on the part of Mr. Ross prevented further sales. Upon receiving the trust deed the defendant applied to Mrs. Barras and Mr. Ross to join him in completing the plat of Weimer's Field and in selling the lots, which they declined to do. In order to make it possible to put the property on the market he arranged for the purchase of their interests, which, after some lengthy negotiation and considerable difficulty, were purchased on May 29, 1908, by Mrs. Youngs and Mr. McDonald, who joined with the defendant in making and recording a plat known as "Youngs' Division to Iron River." This plat, in a general way, followed the survey previously made under the direction of the complainant, but defendant found it necessary to make an entirely new survey in order to place the permanent monuments at the various corners required by law, which had been neglected in the original survey.

The defendant had sent the complainant, in connection with his Nevada deals, sums of money, from time to time, approximating the sum of $9,000, and had also sent him certain sums of money as loans for his personal use, and had at his request advanced other sums to his wife. The defendant claimed that the complainant had applied to his private use some of the moneys which he had forwarded for the Nevada enterprise, and there are other disputes relating to the Nevada business, the details of which are not disclosed in this record.

The defendant proceeded to sell the lots under the trust deed, and it is the claim of the complainant that some time prior to April, 1910, and before this suit was started, he asked the defendant for a statement of the sale of these lots and for a settlement, which it is claimed the defendant refused to give him at that time. It does appear, however, that the parties met at Iron River on March 19, 1910, for the purpose of going over and if possible adjusting their joint affairs. According to the complainant's testimony, at that time they reached a full compromise and settlement of all matters in dispute between them, including not only the matters arising under the trust deed, but the Nevada disputes as well, leaving nothing further to be paid by the defendant and nothing further to be done by either but the execution of such instruments as might be found necessary to vest in each his respective share in Weimer's Field in accordance with the terms of the trust deed. The defendant agrees that such a compromise and settlement claimed by the complainant took place, except that it is claimed that it did not include any of the Nevada transaction other than the items of money used by the complainant in his personal affairs from the money received by him for the Nevada business.

On March 21st following this meeting the complain-

ant demanded of the defendant a receipt and release in full of all accounts and matters and controversies between them, and especially to cover the Nevada dispute. But the defendant refused to release the complainant with reference to all the matters in controversy arising out of their Nevada affairs, and the complainant thereupon started this suit on June 19, 1910.

On November 10, 1910, before the answer of the defendant was filed, the parties had another meeting at the defendant's office in Iron River, and some hours were taken in going over the account of the lot sales and all the doings of the defendant under the trust deed. It is the claim of the defendant that he and the complainant at that time arrived at a complete compromise and settlement of all matters in dispute, including the item of money taken by the complainant for personal uses from the Nevada fund, which item was charged to the complainant and credited to the defendant on such settlement, but that the settlement excludes all other matters connected with the Nevada business. This claimed settlement the complainant refused to carry out, whereupon the answer of the defendant was filed, and in due course of time brought to a hearing. It might also be said, as was stated by the chancellor in his opinion:

"In this connection it is due the complainant to say there is no claim in this case of a wrongful, fraudulent, or intentional misappropriation of any of the Nevada funds. On the contrary, there seems to have been a fair dispute whether certain expenditures made by him should be charged to the Nevada business or to the complainant personally."

The questions involved are thus stated by the complainant's counsel in his brief:

*First.* As to the amount due the complainant from the defendant under this trust deed. This will involve, of course, a discussion also of the question or

the effect of the alleged settlement of November, 1910, between the parties.

*Second.* As to whether the provision in the trust deed whereby the complainant agreed to give the defendant a one-eighth interest in the minerals in Weimer's Field constitutes usury.

The chancellor, who saw and heard the witnesses, found that it was established by a fair preponderance of the evidence that the parties reached a compromise and settlement of all their matters on the terms claimed by defendant on November 10, 1910. A reading of the testimony of the witnesses who were present at the discussion, and that of the parties themselves and of the counsel who were called in to prepare necessary papers, is convincing that this conclusion of the court below was fully justified. The lawyers agree that the form of the papers was to be left to a future conference by them, but that the details of the settlement were agreed upon there can be no question. By this agreement it appears that the defendant was to pay to the complainant $1,100 in cash. It also appears that on the morning after this meeting the complainant again came to the office of the defendant and asked him for $100, which he received from the defendant, and thereupon gave a receipt, which reads as follows:

"$100.    IRON RIVER, November 11, 1910.

"Received from G. W. Youngs check No. 834, being payment of our Weimer deal settlement, one hundred dollars.    A. C. BARRAS."

By this receipt, in our opinion, he clearly ratified in terms the agreement made the day before.

The compromise and settlement agreed upon between the parties is thus stated by the chancellor in his opinion:

"The defendant was charged with all money collected by him upon sale of lots, and was credited with all money paid to or on account of the complainant,

including the money expended by the complainant for his own use out of the Nevada funds, which left a balance in favor of the complainant of $1,100, which the defendant agreed to pay in cash; in arriving at these figures all lots sold, whether fully paid for or not, were treated as fully paid, and the defendant was charged with the full contract price thereof, and was given the right to collect and retain all sums then due or thereafter to become due on any and all lots of the plat at that time sold and not fully paid for; it was agreed that the mineral rights of Weimer's Field, platted and unplatted, originally owned by the complainant, should be divided equally between them, one-eighth to the complainant and one-eighth to the defendant, and that the surface of the unsold lots of the plat and of the unplatted part of Weimer's Field should also be divided equally between them, one-eighth to the complainant and one-eighth to the defendant, and that the one-eighth surface interest of the complainant in all lots at that time sold and not deeded should be deeded to the defendant, and that all the interest of the defendant under the trust deed in the N. ½ of the N. E. ¼ of section 26 and the N. E. ¼ of section 36 should be conveyed to the complainant. The settlement did not include any of the Nevada transactions of the parties, except the item of money used by the complainant for his private affairs out of the Nevada funds."

It is claimed, however, that this settlement is not binding upon complainant because defendant acted in bad faith in that he did not disclose to the complainant that the lots had been sold on time, and that he had received interest thereon, which constituted a legal fraud against the complainant. In this connection it should be considered, however, that the complainant is a trained lawyer and shrewd business man, and had had considerable experience in real estate transactions, and it seems incredible that he did not know that, as a usual custom, deferred payments on land contracts carried interest. We are fully satisfied that after the discussion on November 10th the minds of the parties met and a complete settlement

was agreed upon, and also that there was no fraud intended and no fraud practiced upon the complainant in the settlement, and that there was no hiding of the fact that any interest was due from the purchasers of these lots. We are also satisfied that this settlement was a fair and equitable adjustment of the matters in difference between the parties.

In the discussion of the second question here involved, as to whether the provision in the trust deed whereby the complainant agreed to give to the defendant an undivided one-eighth interest in Weimer's Field constituted usury, it is necessary to first determine the situs of the contract. The situation before us here is that a resident of Michigan, while temporarily sojourning in the State of Nevada, makes another resident of Michigan a proposition as to a trust deed. The defendant prepares a draft of the trust deed in Michigan and sends it on to the party in Nevada for execution, which is effected. It would seem that under these circumstances, when the party in Michigan drafted the deed in accordance with the request of the party in Nevada, the minds of the parties must be held to have met in Michigan at that time, and therefore it must be said to be a Michigan contract. In the case of *Mott* v. *Rowland,* 85 Mich. 561 (48 N. W. 638), this court said:

"It has been frequently held that the place where the terms of a contract are agreed upon governs, rather than the place where the evidences of agreement are executed. *Bank* v. *Low,* 81 N. Y. 567 [37 Am. Rep. 533]; *Coal Co.* v. *Kilderhouse,* 87 N. Y. 430. In the last case cited the court say:

" 'The only time the parties were together or in communication was August, 1875. The bank then yielded to the application of the debtor, and consented to an extension upon certain precise and defined terms. They were accepted by the debtor. At that moment the minds of the parties met. This was in Michigan. That State, therefore, was not only the place of

contract, but, on the part of the bank, was the place of per-
formance. Ingram complied with the contract afterwards in
Buffalo, but what he did there, while in the performance of
an agreement, was in the performance of one already made.'"

It is clear that everything that was to be done un-
der this trust deed was to be performed in Michigan,
and in the case of *Douglass* v. *Paine*, 141 Mich. 485,
497 (104 N. W. 781), Justice HOOKER, speaking for
this court, said:

"The rule that a contract is to be interpreted ac-
cording to the law of the place where it is made is
subject to the exception that

" 'If by the terms or nature of the contract it appears that
it was to be executed in another country, then the place of
making the contract becomes immaterial, and the law of the
place where the contract is to be performed governs, in deter-
mining the rights of the parties. If a contract is made in one
State or country, and it is to be performed in another, it will
be presumed that it was entered into with reference to the
laws of the latter, and those laws will be resorted to in ascer-
taining the validity, obligation, and effect of the contract.' 1
Beach on Contracts, 592, 606.

"See, also, 9 Cyc. 582, subd. 3; *Paret* v. *Bryson*,
Fed. Cas. No. 10,710; 2 Parsons on Contracts (9th
Ed.) p. 734 *et seq.*"

See, also, *Stack* v. *Lumber & Cedar Co.*, 151 Mich.
21 (114 N. W. 876, 16 L. R. A. [N. S.] 616, 14 Am.
& Eng. Ann. Cas. 112); *Palmer* v. *Hill*, 140 Mich.
468 (103 N. W. 838).

The question as to whether the agreement to con-
vey the interest in the land, in addition to the rate of
interest provided for in the deed, made the deed a
usurious contract is clearly discussed in the opinion
of the learned chancellor, whose conclusion with refer-
ence thereto is here set forth, and is adopted by us:

"The claim of the complainant is that the considera-
tion for the agreement to transfer one-eighth of the
land was the loan of money to redeem and to pay

taxes; that the effect of the agreement was to provide
for interest on the money loaned greatly in excess of
the maximum rate allowed by law, and consequently
usurious and void at least as to the excess at the option
of the complainant. That the consideration for the
transfer of one-eighth of the land was the loan is not
accepted. On the contrary the conclusion from all
the evidence is that the consideration for such transfer
was services to be rendered by the defendant. The
trust deed contemplated various services to be per-
formed by the defendant. He was required, not only
to furnish money for redemption, but to actually effect
redemption by paying over to the proper person or
depositing with the proper office the redemption
money. He not only was expected to furnish money
for the payment of taxes, but he was to pay the taxes,
and to that end pay the money to the proper treasurer
and procure a proper receipt. If occasion arose he
was to negotiate and execute options for mining leases
of any or all the lands covered by the trust deed. He
was to arrange with the other owners for their con-
sent to the making and recording of the proper and
lawful plat, and bring them in accord with himself
in relation to prices, terms of sale, and in all other
matters pertaining to any and all the lands covered
by the trust deed, which both parties had reason to
anticipate would be, and, as appears, was, no light
task, owing to the bad blood between the complainant,
his mother and Mr. Ross. Finally he was to sell and
dispose of the lots 'in such manner and for such terms
as he might from time to time deem proper and profit-
able.'

"It is insisted provision for payment for the
services of the trustee will be found in the sixth clause
of the trust deed, which reads: 'All the expenses and
incidental charges of the trustee, incurred by the
trustee in discharge of the trust hereby created, shall
be deducted from the income from Weymer's Field.'
The use of the word 'incurred' renders a construction
of the clause simple and its meaning sure. Under that
clause of the deed the defendant was entitled to de-
duct from the fund all the expenses and incidental
charges incurred by him, that is to say, for which
he became obligated to others, but he would find no
warrant in the language of that clause for retention

by him of any part of the fund as compensation for any services performed by himself in furtherance of the trust.

"It is urged that the value of an undivided one-eighth of Weimer's Field was greatly in excess of the value of the services, whether the services were slight or otherwise, important or otherwise; and, whether they were to be performed partly for the benefit of the defendant as well as the complainant, the parties had the right to contract for such rate and form of compensation as they saw fit. It is only in cases where there is suspicion, as in *Anderson* v. *Smith,* 108 Mich. 69 (65 N. W. 615), that services are used as a cloak to hide usury that the relative value of the services and compensation will be inquired into. The facts and circumstances here do not warrant such suspicion, but should it be thought otherwise and the relative value of services and compensation be a proper subject of inquiry, the conclusion would be that the compensation as related to the services was no more than fair and reasonable. We must deal with the situation at the time the contract was made. The services required of the defendant were neither easy nor unimportant. They were all serious, and some difficult, and called for prompt, constant, and intelligent attention. To his efforts alone the success of the enterprise upon which the parties at that time engaged is due. As compensation for those services, in so far as they were for the benefit of the complainant, the defendant was given one-eighth of a tract of land, the highest offer the complainant was able to get for a quarter of which was $1,500, the whole of which price, plus taxes and interests, the property must pay before the part given to the defendant would be of any value. This offer of $1,500, so far as the record advises us, was for an undivided one-fourth of the tract, surface, and minerals, but if only for the surface, it will be recollected that neither then nor at the hearing did the complainant or any one place any mineral value on Weymer's Field. Furthermore, whether the one-eighth interest in the land would ever be of any value depended on contingencies; whether the land boom then in its inception at Iron River would continue and would not halt or collapse; whether the other owners would join in a plat, and if so, whether they

would agree with the defendant on prices and terms of sale; whether a market could be found for the lots and the unplatted portion of Weymer's Field, which would produce the redemption and tax money and the interest thereof, all expense attending the sale of the lots, and leave any surplus. When the trust deed was signed and delivered it could not be said with certainty that an undivided one-eighth interest of Weymer's Field was worth $1 above the redemption money, which was approximately $1,500, plus taxes and the interest, which might run one year or any number of years, and it can be said with certainty that $1,500 was the best price which the complainant could obtain for double that interest in the land, and which price he was ready to accept. This case is unlike *Anderson* v. *Smith, supra.* There the contract provided how compensation for the services of the trustee should be ascertained and paid, outside the item which it was sought to recover as for services, and which was not contingent or uncertain, but fixed and certain, and it appeared the services contemplated and actually rendered were trifling, and it was clear the item for which recovery was sought could have been intended only as interest on the loan.

"The fact that commissions on sale of lots was allowed in the accounts of the defendant is not entitled to a place in the discussion of the question of usury. The trust deed does not provide for commissions, and their allowance was the subject of a subsequent agreement between the parties, the effect of which was to add to the defendant's compensation, but not to substitute commissions for the land transfer provisions of the trust deed."

We are therefore of the opinion that the contract is not usurious, as we are satisfied of the *bona fides* of the claim of the services rendered and to be rendered under the contract, and of the reasonableness of the compensation therefor provided. It does not therefore come within that class of cases where it has been held that:

"No disguise of language can avail for covering up usury or glossing over a usurious contract." *Conti-*

*nental National Bank* v. *Fleming,* 170 Mich. 624 (134 N. W. 656).

Paragraph 8 of the complainant's bill calls attention to an error which was due to the oversight of the scrivener in drawing the instrument. This error is conceded by the defendant, and was corrected by the chancellor in his opinion and decree.

The question has also arisen as to whether under the pleadings filed the court could give the relief granted by the decree made herein, it appearing that the bill of complaint simply prayed for an accounting and a quieting of the complainant's title to the premises, and that the defendant be required to convey to complainant all the premises, and also contained a prayer for general relief. The defendant's answer denies the allegations of the bill of complaint, and sets up the alleged settlement of November, 1910, which occurred after the bill of complaint was filed, but asks for no affirmative relief. The failure of the defendant to ask for affirmative relief and to file an answer in the nature of a cross-bill presents, in our opinion, insurmountable difficulty in affirming the decree of the court below in all respects. It has been held by a long line of decisions in this State that a defendant can only obtain affirmative relief by an answer upon incorporating in the answer the essential requirements of a cross-bill. The pleadings are not framed so as to make it possible to grant the relief given to the defendant. *Village of Trenton* v. *Rucker,* 162 Mich. 19 (127 N. W. 39, 34 L. R. A. [N. S.] 569), and cases therein cited; *Tuthill* v. *Katz,* 174 Mich. 217 (140 N. W. 519).

We are of the opinion that with the exception of the error complained of in paragraph 8 of the bill, and which it is conceded should be corrected, the other relief prayed for in the bill should be denied, and that the decree of the court below, in so far as it grants

affirmative relief to the defendant, cannot be sustained. Such relief must be sought for in another proceeding. In view of this conclusion, no costs will be allowed to either party.

BROOKE, C. J., and MCALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.