## Ashland National Bank, Trustee v. Conley et al.

(Decided December 6, 1929.)

WOODS, STEWART, NICKELL & SMOOT and ORVILLE C. SANBORN for appellants.

MARTIN AND SMITH and J. B. ADAMSON for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

In the year of 1925, the city of Ashland was experiencing a rapid growth. The demand for money to finance real estate and building operations was very acute and greater than the supply forthcoming from that community. Sensing the situation, a number of prominent gentlemen of Ashland organized the appellant Southern Securities Corporation, with a capital stock of $300,000. The powers of the corporation under its articles were very broad, including the right not only to act as broker for others in the procurement of loans, but also the right to lend its own money. After its organization, the corporation entered into a contract

with the Security Trust Company of Lexington, Ky., whereby the latter agreed to buy from the Southern Securities Corporation all bonds offered for sale by the Southern Securities Corporation on the principal and interest being guaranteed by the Southern Securities Corporation and the National Surety Company. Under the contract, the Southern Securities Corporation agreed to sell to the Security Trust Company all bonds which it should thereafter offer for sale. The contract by its terms was to continue until December 31, 1925, and thereafter until terminated by either party upon written notice. The Security Trust Company was to pay for the bonds in cash but at a discount of 2 per cent. from their face value. After these arrangements had been made, the Southern Securities Corporation proceeded to advertise in the local papers, inviting applications for loans, and in these advertisements it was stated that the interest was based on 6 per cent., 10-year plan, and that no brokerage was to be deducted.

Some time in the fall of 1925, the appellee A. S. Conley and Mary Noyes Conley, his wife, who were then in Florida, having seen the advertisement of the Southern Securities Corporation wrote to the Company that they desired to raise a loan of $6,000 on some property they owned in Ashland. On receipt of this letter, the Southern Securities Corporation sent the Conleys an application blank.

In skeleton outline the application reads: "The undersigned hereby applies through Southern Securities Corporation to procure for the undersigned a loan of $6,000 with interest at the rate of 6% per annum payable semi-annually and offers as security therefor a first mortgage on the following property." Here follows a description of the Conley property, together with certain information concerning the property not here pertinent.

Then follows: "The undersigned hereby agrees to pay the Southern Securities Corporation the following items of expense." Here follows a list of such expenses, including attorney's fee for examining the title, the cost of an appraisal of the property and survey, fire and tor-nado insurance premiums, and certain other expenses.

The application continues: "All of said expenses are to be payable upon demand but not later than the date when the proceeds of the loan are paid over to me.

I also agree to pay the Southern Securities Corporation 'the sum of $1,017 to cover, first, amounts charged by the National Surety Company and Southern Securities Corporation for their respective guarantees of the payment of the principal of bonds evidencing said loan and the interest coupons thereto attached as they severally become due secured by said mortgage or deed of trust. Second, the payment of all other costs and expenses incurred by the Southern Securities Corporation in connection with obtaining this loan, including its charges and fees thereof, said amount to be evidenced by my note or notes and to be secured by mortgage on said premises subordinate, however, to the mortgage or deed of trust securing the bonds and the interest coupons hereinbefore referred to'' (viz. the $6,000 loan) ''and in order to provide a fund with which to retire and pay said bonds with the interest coupons thereto attached and the note or notes executed for the expenses and fees hereinbefore stated, I agree to pay to the Ashland National Bank, trustee, Ashland, Kentucky, the sum of $——— on the ——— day of each and every month after the making of said loan and during the period therefor. Said loan is to be for the period of ten years payable in the manner stated.''

The Conleys signed this application and sent it back to the Southern Securities Corporation. The loan being approved, the bonds and mortgage were prepared, and in the middle of December, 1925, the transaction was closed. In the mortgage indenture the appellant Ashland National Bank was made the grantee as trustee for the bondholders, and the bonds mentioned in the deed of trust and mortgage were made payable to bearer. The series of bonds aggregating $6,000 principal amount was secured by a first lien on the property, and the series of bonds aggregating $1,017 principal amount was secured by a second lien on the property. The papers had been prepared with the date of December 1, 1925, and, as the transaction was not closed until the middle of December, in order to avoid the redrafting of the documents, the Southern Securities Corporation gave to the appellees its check on its bank account for the accrued interest from December 1st to the date of the closing of the transaction. At the same time it gave to the Conleys its check on its own bank account for the $6,000 evidenced by the

bonds secured by the first lien. The Conleys paid in cash at that time for the expenses first mentioned in their application; that is, the cost of the title examination, survey, etc. The Southern Securities Corporation, after placing its guaranty on the bonds representing the $6,-000 part of the transaction, at once transmitted them to the National Surety Company in New York, which placed upon these bonds its guaranty, and then delivered them to the New York correspondent of the Security Trust Company of Lexington. This correspondent received for the Security Trust Company these bonds as thus guaranteed, and debited the trust company's account by the accrued interest on the bonds and their face value, less the 2 per cent. discount provided for in the contract between the Southern Securities Corporation and the Security Trust Company, and credited the account of the Southern Securities Corporation by the amount thus debited. It is shown in the record that the Security Trust Company relied entirely on the guaranty of the National Surety Company, and made no inquiry concerning the solvency of the makers of the bonds sold them by the Ashland Company or the value of the security back of the bonds. It is also shown in the record that the amount of the premium which the Southern Securities Corporation agreed to pay to the National Surety Company for its guaranty on these bonds plus a like amount which the Southern Securities Corporation says is a reasonable compensation for its guaranty of these bonds and the 2 per cent. discount at which these bonds were sold to the Security Trust Company of Lexington, consume almost all of the $1,017, secured by the second lien. It is also shown that the balance of this $1,017 barely if at all covers the overhead expense of the Securities Corporation incurred in the printing of these bonds, their marketing, and the services rendered incident to the monthly payments of the Conleys on their indebtedness. In the deed of trust, it was provided that the Conleys were to pay the sum of $78 beginning with the 15th day of December, and a like amount every month thereafter for 120 months, and that these payments were to be applied, first, on the interest of the indebtedness secured by the mortgage, and then on the bonds secured by the mortgage as they fell due. The Conleys made seventeen payments as thus provided, and then stopped

and made no more. The Ashland National Bank as trustee thereupon elected, as it had a right to do if there was a default on the part of the Conleys, to declare the debt evidenced by the bonds secured by the mortgage and then unpaid at once due and payable, and it then brought this suit to foreclose the mortgage. The Conleys were duly summoned, and filed their answer and cross-petition against the Southern Securities Corporation, in which they made, in substance, the claim that the bonds aggregating $1,017 and secured by the second lien on the mortgaged property in fact represented usury. They asked that the payments which they had made be applied, first, to the payment of the interest on the $6,000 of first mortgage bonds, and then on the principal of the same, and that the second lien notes be canceled. The Southern Securities Corporation contested this claim of the Conleys by asserting that the item of $1,017 was for services and expenses and did not represent usury. Proper pleadings completed the issues. On final hearing, the court granted the Conleys the relief they sought on their cross-petition, gave the appellant Ashland National Bank as trustee judgment on the first lien bonds subject to the credits as prayed for by the Conleys and ordered a sale of the property. From that judgment the Ashland National Bank as trustee and the Southern Securities Corporation appeal.

The principles of law applicable to the solution of the questions raised by this case are simple. The difficulty arises in their application. It is settled that, where the borrower agrees to pay the lender a sum greater than the legal rate of interest, if the consideration for this agreement is the use of the money loaned, it constitutes usury, but, on the other hand, if the consideration is for services actually rendered to the borrower and the agreement for services is made in good faith, and is not a cloak to conceal usury, the transaction is not an usurious loan. The rule is thus stated in 27 R. C. L. 231: "The law seems to be well settled that where a contract for a loan provides for the rendition of services by the lender to the borrower, a fair charge for the services, in addition to the legal rate of interest on the money loaned, does not render the contract usurious. . . . But on

accepted principles, a charge or commission for alleged services cannot be made for the purposes solely of evading the usury laws.''

Thus it is held that a lender who lends his own money may not charge the borrower brokerage fees or commissions for making the loan, where such charges in connection with the agreed interest exceed the legal rate as such charges are in fact for the use of the money, and hence usury. Commonwealth Farm Loan Co. v. Caudle, 203 Ky. 761, 263 S. W. 24. On the other hand, it is well settled that the lender may legitimately require the borrower to pay the actual and reasonable expense of examining and appraising the security, Fisher v. Adamson, 47 Utah, 3, 151 P. 351; Liskey v. Snyder, 56 W. Va. 610, 49 S. E. 515; Matthews v. Georgia State Savings Association, 132 Ark. 219, 200 S. W. 130, 21 A. L. R. 789; and for services in good faith rendered the borrower other than the mere loaning of the money. Myers v. Williams, 85 Va. 621, 8 S. E. 483; Barras v. Youngs, 185 Mich. 496, 152 N. W. 219; Righter v. Philadelphia Warehouse Co., 99 Pa. 289. It is also settled that the borrower may pay his own agent or broker for the latter's services in procuring a loan without rendering his obligation to the lender for the loan thus procured usurious. Union Central Life Ins. Co. v. Edwards, 219 Ky. 748, 294 S. W. 502; Webb v. Southern Trust Co., 227 Ky. 79, 11 S. W. (2d) 988, 989.

In the case of G. L. Miller & Co. v. Claridge Manor Co. (D. C.) 14 F. (2d) 859, 860, the facts were that the defendant, a real estate concern, wished to float a bond issue on an apartment house it intended to erect. The plaintiff was a bond selling house which specialized in underwriting bond issues of this character. It agreed to take over the bond issue at a 15 per cent. discount from the face value of the bonds. It was contemplated by the parties that the money advanced to the defendant by the plaintiff was not to be invested by the plaintiff, but was to be secured through them by selling the bonds to many buyers, although the money advanced was in the first instance the money of the plaintiff; it reimbursing itself through the sales of bonds. The cost of sale of the bonds by the plaintiff was quite substantial as the parties well

knew. The court held that the 15 per cent. discount did not constitute usury under the Alabama Laws. It said:

"If the transaction was no more than a sale of the entire issue of bonds by the defendant to Miller & Co., and it was not contemplated that Miller & Co. were to resell in small lots at a substantial cost, in order to realize money for the bonds, then, whether Miller & Co. be considered a lender or purchaser, the transaction would be infected with usury. The only consideration for the discount would then have been the use. of the money furnished defendant by Miller & Co. On the contrary, both Miller & Co. and the defendant knew that the money agreed to be furnished was to come from the proceeds of resales in small lots of the bond issue, to be effected by Miller & Co.'s organization. Such services were to be rendered for defendant's benefit, since the needed money could be procured only in that way. While the written contract under which Miller & Co. were to handle and distribute the bonds might justify the inference that Miller & Co. acquired the bonds from defendant for a fixed amount, and that defendant had no further interest in their disposition after receiving the amount, yet the situation of the parties, what they desired to accomplish, and the surrounding circumstances indicate that the parties. contemplated resales of the bonds by Miller & Co. as a necessary factor in procuring the money agreed to be furnished, and that the services in effecting the resales, looking through form to substance, were for the benefit of defendant, and were of substantial value— not a cloak to cover usury. The bonds had to be resold to finance the building. If Miller & Co. had stood the cost of handling and distributing, it could not have taken over the bonds at their face value, unless it could have resold them at a substantial premium. The bonds bore interest, and this furnished the means of compensating for the use of the money. The discount retained by Miller & Co. was to compensate for the necessary expenditure incurred in handling and distributing the bond issue. It would not constitute usury, unless made with intent to defeat the usury law.

"In view of the necessity arising from the nature of the transaction and involved in a redistribu-

tion of the bonds, that such services be performed by some one, and the propriety of the defendant, as between it and Miller & Co., paying for them, I do not think that the record shows that the agreement for the discount was a mere evasion of the usury laws. It was to provide compensation for service agreed to be performed by Miller & Co. for defendant and at its request. If the discount be construed to be compensation for services, its amount does not present an issue, unless it is so out of proportion to the value of the services as to show bad faith. No evidence was offered as to any disproportion to the expense agreed to be incurred by Miller & Co.''

The Webb case, supra, was very similar to this Miller case. In the Webb case, Webb executed to the Southern Trust Company a mortgage on his land to secure $43,000 evidenced by notes payable 10 years after date, with interest at 5½ per cent per annum, and also a second mortgage to secure a note for $1,200 bearing interest at the rate of 6 per cent. for a commission due the trust company for procuring the loan for Webb. The question was whether the transaction was usurious or not. The court said:

"The facts are undisputed. The trust company was not in the business of lending money. Its business was that of procuring loans on farm mortgages. It simply acted as a go-between and in fact was the correspondent of a number of corporations lending money, one of which was the Metropolitan Life Insurance Company, with which it had a written contract to act for it. By this contract the life insurance company reserved the right not to take a loan unless satisfactory to it. The mortgages were made July 16th. The money was sent to Webb a few weeks later, and the mortgage was assigned to the Metropolitan Life Insurance Company August 14th. The trust company did not know positively that the Metropolitan would take the loan until the Metropolitan approved it, but it made the loan and advanced the money, expecting the Metropolitan to approve the contract, and, if the Metropolitan had declined to do this, it would then have placed the loan

with one of its other correspondents. But it is clear from all the proof that it had no intention of lending the money itself. It only advances it temporarily to get the transaction closed. None of the interest was in fact paid to it. The notes and interest were payable at its office, and it was the agent of the Metropolitan to collect the money for it, and, though it received the money, it was in fact received as the agent of the Metropolitan. The transfer to the Metropolitan was of record just as the mortgage was of record. The written contract which Webb made simply employed the trust company as his agent to secure the loan for him, and for its services he agreed to pay it 5 per cent. Under all the facts the court cannot say that this was a mere device to evade the usury laws.''

With these principles of law as thus developed by the cases in mind, let us examine the facts as disclosed by the record in this case. The Conleys did not testify, and the entire evidence consists of the testimony given by the officers and directors of the Southern Securities Corporation, an officer of the Security Trust Company, and a newspaper publisher; the testimony of the latter going only to the advertisements put out by the Southern Securities Corporation. From the evidence of these gentlemen, it is perfectly plain that the purpose of the Southern Securities Corporation was to act as a broker or underwriter for those desiring loans. The capital stock of the Southern Securities Corporation would have soon been exhausted had it undertaken to go into the business solely of loaning its own money. Its idea was in financial parlance to underwrite loans for those who desired to raise money, and that any loans underwritten would have to be put upon the market and sold. That the Conleys knew and assented to this purpose seems to us plain from the form of the application they signed and the manner in which the transaction was closed. In the first place, the Conleys did not apply for a loan *from* the Southern Securities Corporation, but for one *through* this company. In the second place when it was itemized in the application what the $1,017 of second lien bonds was to cover, it was specifically stated that two of these items were for the guaranty of the National Surety Company and of the Southern Securities Corporation. Just why

there should be any difference between the appellee being liable for the cost of the guaranty of the National Surety Company and the cost of the title examination is not answered anywhere in appellee's brief, and the fact that the bonds were to be guaranteed, not only by the National Surety Company, but also by the Southern Securities Corporation too, is highly evidential of the fact that the parties expected these bonds to be sold on the market, for there would have been no need for the Southern Securities Corporation to guarantee them if the bonds were to be retained in the investment portfolio of the Southern Securities Corporation. Further, the mortgage was not executed to the Southern Securities Corporation, as it was in the Miller and Webb cases, supra, but to the Ashland National Bank, as trustee, and the bonds were made payable to bearer, a fact indicating that they were expected to be passed on without delay to purchasers in the ordinary course of bond trading. The conclusion is inescapable that the parties contemplated, not that the Southern Securities Corporation was lending its money to the Conleys beyond, as the Webb case says, an advancement by way of accommodation, temporary expedient and convenience until the bonds could be disposed of, but that it was employed to float or underwrite this loan for the appellees. This being true, the agreement to pay the $1,017 which, as the evidence shows, is but reasonable compensation for the services for which this sum was charged, is not an usurious transaction, but a payment to the agent of the borrower for services rendered the borrower in good faith. The Commonwealth Farm Loan Company case, supra, relied upon by the appellees, is not in conflict with these views. The statement of facts there shows that the loan company only occasionally disposed of the bonds representing loans made by it, that it took the notes and mortgage in question in that case to itself, and it was not shown that it had any purpose other than to hold the notes in its own investment portfolio, and so it was rightfully held that the agreement to pay the loan company 5 per cent. commission for the loan was an usurious transaction. But here the payment of $1,017 was for services rendered in good faith and which it was contemplated were to be rendered, and thus the cases are distinguishable.

On the whole, we are of the opinion that the facts of this case bring it within the rule of the Miller and Webb cases, and that the lower court erred in cancelling the bonds evidencing the $1,017 item in the application.

Its judgment is therefore reversed, with instructions to enter a judgment in conformity with this opinion.

Whole court sitting.