**BALTIMORE TRUST CO. et al. v. SANDERS et ux.**

No. 8428.

Court of Civil Appeals of Texas. Austin.

March 17, 1937.

Rehearing Denied April 14, 1937.

Raymond E. Buck, Victor C. McCrea, and Mack & Mack, all of Fort Worth, for plaintiffs in error.

Glenn R. Lewis and O. C. Fisher, both of San Angelo, for defendants in error.

McCLENDON, Chief Justice.

Suit by Sanders and wife against the bond company (National Bond & Mortgage Corporation), the trust company (Baltimore Trust Company), and Henry

H. Laithe, trustee, to cancel three notes and trust deeds securing them, executed by Sanders and wife in favor of the bond company; on the ground that the transaction was usurious and the payments made by Sanders and wife when properly credited to the principal debt discharged it. The trust company by cross-action sought recovery on notes 1 and 2, with foreclosure of the trust deed lien. The trial was to the court without a jury; and, upon findings supporting the plea of usury, judgment was rendered cancelling notes 2 and 3 and the trust deed securing them, crediting note 1 with payments reducing the principal thereof to $202.50, and giving the trust company judgment for that amount plus $20.25 attorney's fees, with foreclosure of the trust deed lien. There was also recovery over in favor of the trust company against the bond company. That portion of the judgment, however, is not brought in question, the appeal being only by the trust company and Laithe.

The governing facts follow:

February 27, 1928, Sanders and wife executed three notes in favor of the bond company, securing note 1 by a first trust deed on business property in San Angelo upon which they were erecting a store building; and securing notes 2 and 3 by a second trust deed upon the same property. Note 1 was for $6,000, bearing 6 per cent. interest per annum from date, interest payable monthly for the first 36 months. Thereafter $87.66 a month was to be paid and credited first to interest and the balance to principal until the note was discharged. Note 2 was for $1,112.70 and bore interest at 6 per cent. per annum from date. It was payable in monthly installments of $26.22 until February 27, 1931, and monthly installments thereafter of $4.-38 until the note was paid. These installments were to be credited first upon the interest, and the balance upon the principal. Each of these notes had an acceleration clause maturing it at the option of the holder upon default in payment. Note 3 was for $622.08 and was payable, without interest, in 36 monthly installments of $17.-28. This note recited that it represented "compensation to the payee hereof in negotiating, handling and supervising during its continuance for us a loan represented by our note" (No. 1); and that "if the maturity of said note No. 1 shall be accelerated in whatever manner, no part of this note shall be collectable except the install-

ments thereof accrued to the date of the acceleration of said Note No. 1."

Compton was the agent of the bond company at San Angelo, with whom Sanders negotiated in the transaction. Sanders testified that his agreement with Compton was for a loan of $6,000 to be paid off at the rate of $90 per month; and he exhibited canceled checks showing that he had made 61 such payments ($5,490). No money was paid to Sanders, but the bond company paid out for his account: To a lumber company $5,430; for recording fees $15.50; to Maryland Casualty Company, "for warranting mortgage" $30; to Century Trust Company (later merged with appellant trust company) for "commission for sale of bonds" $360; for abstract of title $42.50; for appraiser's fee $10; for insurance $194.50. The court disallowed the ·$360 and $30 items for commission and premium on surety bond, but allowed all the others, making the total amount paid for Sanders' account $5,692.50. Deducting from this Sanders' payments of $5,490 gives the amount of the judgment $202.50.

■ Appellants rely upon an application for the loan by Sanders as freeing the transaction of any taint of usury. Since in large measure the controlling issues in the case involve a proper construction of this instrument, we quote in full the provisions in any way bearing upon the questions presented:

"M. Sanders and wife, Hortensia (hereinafter referred to in the plural number, whether one or more), hereby apply to you to obtain a loan for us for Six Thousand and no/100 Dollars ($6,000.00) for which we will execute our three promissory notes, dated as of the date of your acceptance hereof, as follows: Note No. 1, Principal $6,000.00, interest six per cent per annum from date, payable monthly as it accrues until the 38th month, and on the 27th day of each month from the 38th month to the 121st month, both inclusive, $87.66 to be paid and to be applied first to the interest and any balance to the principal until the note is fully paid; Note No. 2 for $1,112.-70 with interest at six per cent per annum from date, payable in installments of $26.-22 each month on the 27th day of each month from the second to the 37th month, and $4.38 on the 27th day of each month, from the 38th to the 121st month, both inclusive, to be applied first to the interest and the balance to the principal, Note No. 3 for $622.08, without interest, payable in

installments of $17.28 each, on the 27th day of each month from the second month to the 37th month, both inclusive.

"We understand our total monthly payments will be $73.50 on the first day of each month from the second to the 37th month, both inclusive, and $92.04 monthly thereafter.

"You are to retain the payments made upon our Note No. 3 as compensation to you for services to us in negotiating, handling and supervising this loan for us during its continuance.

"We understand you are not loaning your own money but will obtain this loan for us by pledging our Note No. 1 as collateral under the terms of one of your collateral assignments or deeds of trust under which you issue and sell your certificates or bonds secured by our notes and other notes, which notes before being so pledged must be guaranteed by a bond of a casualty or surety company. We understand you will incur certain expenses in preparing, printing and selling your bonds or certificates, having our note guaranteed, as compensation to the Trustee of your assignments of deeds of trust, handling the collections on our note and keeping records of same, and keeping informed as to the payment of taxes and insurance on our property, and general supervision of the loan and its security, and other costs to you in connection therewith. To reimburse you these expenses you are authorized to have deducted from the proceeds of our loan $————, and further to apply thereon the payments made on our Note No. 2. If at any time the amount paid by us to you on our Note No. 2, together with interest paid thereon, should exceed your said expenses, you are to hold same and pay therefrom your actual reasonable expenses of the kind specified above incurred by you thereafter in connection with this loan. If said amounts paid on said Note No. 2 at the first of any month after the 37th month exceed your said expenses to such current month you may apply a sufficient amount thereof monthly thereafter to pay you an additional compensation for negotiating, handling and supervising this loan during its continuance equal to two per cent interest on the unpaid balance of said Note No. 1, it being understood that said Note No. 3 and said additional two per cent is compensation to you for your said services and is not additional interest on said loan. If at the final payment of Note No. 1 any balance of the payments made on Note No. 2 remains after paying said expenses and compensation, you are to return the same to us.

"Each year you are to compute the rate of interest on the unpaid principal of Note No. 1 that the interest thereon and your said compensation would be if paid as interest thereon. If this rate and the interest on any balance in your hands from the proceeds of Note No. 2 computed at said rate should exceed ten per cent (10%) on the unpaid principal of Note No. 1 for such year, if all were considered as interest thereon, then you are for such year to credit us with interest on any balance of the proceeds of Note No. 2 at the rate of interest as computed in the manner set forth in the first sentence of this paragraph.

"If the maturity of Note No. 1 is accelerated, we are to pay you all installments on Note No. 3 accrued to the date of such acceleration and sufficient of Note No. 2 to pay your said expenses. However, as your initial expenses will be more than the initial payments by us, said Note No. 2 is made negotiable in form in order that you may negotiate the same. In the event Note No. 1 is accelerated and Note No. 2 is held by any other party than yourselves, we agree to pay the full amount of Note No. 2 to such party, but you are to return to us any balance of the amount paid on said Note No. 2 in excess of your said actual expenses.

"We agree not to anticipate the payment of Note No. 1, but if we do, we agree in consideration of the privilege of anticipating it to pay, at the time of paying Note No. 1, all the installments of Notes Nos. 2 and 3, and you need not return any balance of the payments of Note No. 2 over your said expenses. Since the loan to us is to run a considerable length of time and your employees keeping your records in connection with our said notes may change from time to time, we agree that in any suit of any nature in any court involving any or all of our said notes, your records in reference to any or all of said notes, your said expenses, and the status of the amounts paid on Note No. 2 may be introduced in evidence upon being identified by their custodian without further proof in connection with them, and they shall be conclusive of the facts shown thereby unless contradicted by evidence."

(Here follow provisions calling for certain data, the blanks for which were not

filled in. Also provisions regarding abstract of title, etc., not pertinent to the case.)

"As from the date of your acceptance hereof you will be in a position to complete this loan, we agree to pay interest on our Note No. 1 from its date. At the time this loan is completed you may deduct from the proceeds any installments on our notes then due and unpaid.

"You are to pay us the proceeds of this loan only when all the above provisions have been complied with, when the improvements to be constructed, if any, have been completed, and you have been satisfied that we have good title to the property and our notes are secured by liens of the kind specified above superior to all other liens (except current taxes not yet due) and that there are no debts in connection with the construction of the improvements that may be later secured by superior liens. * * *

"This application shall be binding upon you only when accepted in writing by one of your duly authorized officers, and when so accepted shall be binding upon and inure to the benefit of you and us, and you and our heirs, legal representatives, successors and assigns respectively."

The instrument concludes:

"Dated at ——— County, State of Texas, this ——— day of ———, 19—.

"Accepted this 25th day of February 1928.

"National Bond & Mortgage Corporation,

"By (Name illegible)

"M. Sanders."

Sanders did not recall having signed the instrument, but admitted the genuineness of his signature.

Appellants introduced copy of that portion of the bond company's books relating to the three notes, showing the amounts paid and the manner in which they were credited. These books were kept in the bond company's general offices at Houston. For convenience of reference these data are appended hereto. (See page 718.)

There was also introduced certain portions of an "Indenture of Trust," dated May 1, 1927, between the bond company on the one hand, and the Century Trust Company of Baltimore and Henry M. Laithe, as trustees, upon the other.

We quote the first five paragraphs of this indenture:

"Whereas, the Company, under proper corporate authority, is engaged in the business of lending money upon mortgages upon real property, and of buying, selling, guaranteeing and otherwise dealing in and with mortgages upon real property and/or instruments of like legal effect, and has full corporate power *power* and authority to issue bonds secured by mortgages and other collateral, and to borrow money and to issue and sell these bonds and obligations from time to time for money so borrowed, and to secure the same by mortgage, pledge, assignment or deed of trust, in the form hereof, of the property hereinafter described, and to make the agreements and covenants herein made and contained, and to execute these presents for the purposes hereinafter set forth, and to do all those things which by this Indenture of Trust the Company is obligated to do, and

"Whereas, to provide for extending its business and for its other corporate purposes, the Company, being thereunto duly authorized by law and by resolutions of its Board of Directors, has determined to create an issue of bonds secured by first mortgages * * *

"Now, therefore, this indenture of trust witnesseth: That in order to secure the payment of bonds and the interest coupons attached thereto, according to their tenor and effect, irrespective of their time of issue or maturity, and to secure the fulfillment of the covenants and conditions herein contained, and in consideration of the receipt of the money set forth in the respective bonds, and the purchase and acceptance of said bonds by the holders thereof, and of the sum of Five Dollars ($5.00) duly paid by The Century Trust Company of Baltimore and Henry M. Laithe, Trustees, to the Company at and upon delivery of these presents, the receipt whereof is hereby acknowledged, the Company has assigned and transferred, and by these presents does assign and transfer unto the Trustees, their successors and assigns, all those mortgages or instruments of like nature, * * *

"To have and to hold the same or the proceeds thereof, which are in the aggregate hereinafter sometimes referred to as the 'Trust Property' unto the Trustees and their successor or successors and assigns forever.

"But in trust, nevertheless, for the equal and proportionate benefit and security of all present and future holders of each and every kind of bond and interest coupons issued and outstanding and secured by this Indenture, and for the enforcement of the payment of the same as and when the same shall become due and payable, in accordance with the provisions of said bonds and interest coupons and this Indenture, without preference, priority or distinction as to lien or otherwise as to any one bond over any other bond by reason of priority in the number, date, negotiation or maturity thereof, or by reason of any other cause, and after the payment of the principal and interest of each of said bonds and interest coupons, or after provision for the payment thereof, as hereinafter provided, then upon the further trusts hereinafter set forth."

The remaining portions of the indenture set forth with much particularity the respective rights and duties of the bond company and the trustees. Generally speaking, the bond company was given the right to withdraw temporarily any securities for the purpose of collection, accounting therefor to the trustees; to substitute other securities for those held by the trustees. Upon payment of the full amount of the bonds and interest secured by the indenture, as well as discharging all other obligations thereunder, the securities held by the trustees were to be returned to the bond company.

Under this indenture note 1 was transferred to the corporate trustee March 19, 1928, and notes 2 and 3 August 28, 1928. It should be noted here that the several sums paid by the bond company for the account of Sanders were by drafts of Compton drawn on the bond company at Houston, and dated March 9, 1928.

It is clear that if the second note be treated as interest the monthly payments on it and note 1 ($30+$26.22=$56.22) would exceed 10 per cent. per annum upon the principal ($6,000) of note 1 ($50 per month) by $6.22 per month, or by $74.64 per annum.

Appellants contend that under the application for loan note 2 "constituted out of pocket expense incurred by plaintiffs in error in arranging a loan for defendants in error, which charge was not interest, but was clearly a valid charge for services." This is predicated upon the proposition that (as stated in the application) appellees applied to the bond company "to obtain a loan for us," and that "we understand you are not loaning your own money but will obtain this loan for us by pledging our Note No. 1 as collateral under the terms of one of your collateral assignments or deeds of trust under which you issue and sell your certificates or bonds secured by our notes, which notes before being so pledged must be guaranteed by a bond of a casualty or surety company." The only evidence of what went to make up the expense items in note 2 was that of appellants' witness Viner, former assistant secretary and treasurer, and then vice-president of the bond company. This was to the effect that the cost of the surety bond was ½ of 1 per cent. and the cost of selling the bond company's bonds was figured at approximately 16½ per cent.; these two items ($1,020) would fall $92.70 short of the principal ($1,112.70) of note 2.

We do not have to go beyond the express terms of the application to demonstrate that the assertion therein that the bond company was not loaning its own money was not true. It may be that borrowed capital upon which the borrower operates is sometimes loosely referred to as the lender's money. But this is true only in the sense that the borrower is a debtor of the lender and his assets are subject to the payment of his debts. In no proper sense can the transaction detailed in the application be classified as that of a brokerage contract whereby the bond company, acting as broker or agent of appellees, procured a loan for them from other parties as lenders to appellees. The loan was made by the bond company to appellees, evidenced by notes payable to the bond company. The relation of debtor and creditor was thereby created. The evidences of the indebtedness, the notes, were the exclusive property of the bond company. When it later transferred the notes to the trustees such transfer was only as collateral security for bonds of the bond company. These were its own obligations and not those of appellees. Under the transfer, while the legal title to the notes vested in the trustees, such title was only held in trust to secure the bond company's outstanding bonds. In its last analysis the transaction was simply one in which the bond company pledged its own property (appellees' notes) as collateral security for its own obligations (its bonds).

Under this state of facts it is clear that the expenses, testified to by Viner as going to make up note 2, were expenses incurred by the bond company in the conduct of its own business; that is, for printing, negotiating, etc., its own bonds and guaranteeing the collateral securing them. They were not in any proper or legal sense expenses incurred or services rendered to appellees by the bond company in the capacity of broker or agent for appellees or otherwise. The bond company might as properly charge to appellees its office rent, salaries of its officers, agents, and employees, and other expenses of operating its business. In fact the application itself is quite indefinite as to what all the expenses so chargeable are to be. In addition to those enumerated (including bookkeeping) are "and other costs to you in connection therewith."

This exact point was ruled in National B. & M. Corp. v. Mahanay, 124 Tex. 544, 80 S.W.(2d) 947, 952, in the following language (adopted by the Supreme Court) of the late Judge Ryan: "The plan devised by the plaintiff in error in the management of its business contemplated the issuance of bonds to obtain money for itself, secured by the first lien notes of various parties who had previously borrowed money from it. The money obtained from the sale of these bonds became the money of the plaintiff in error, and the expenses incident to the sale thereof were not expenses incident to the loan made by it to Allgood, but were expenses incurred in its own behalf in obtaining a loan for itself."

It may be urged that it is not altogether clear whether the holding in this case is rested upon the quoted proposition as one of law, or upon a jury fact finding as later adverted to in the opinion. We think the conclusion expressed in this quotation is a sound and inescapable one of law. However, we have in the instant case an express finding by the trial court that the bond company was not the agent of appellees "to obtain for them the loan," that the transaction "was not a bona fide agency contract, but such procedure was part of the scheme of National Bond & Mortgage Corporation devised to enable the collection of interest beyond 10 per cent. per annum on the money loaned by it." The record abundantly supports this finding, conclusively so as a matter of law, we believe, but in any event factually.

We have carefully perused the Kentucky case of Ashland Nat. Bank v. Conley, 231 Ky. 844, 22 S.W.(2d) 270, strongly relied upon by appellants. Conceding, arguendo, that the correct conclusion was reached upon the case there presented, it furnishes no authority for the contention that the bond company here was acting as broker or agent and not lending its own money. We concur in the general principles announced in that case which will be found on page 272, col. 1 of 22 S.W. (2d). We hold that the trial court correctly applied them in the instant case. We do not think it necessary to burden this opinion with an analysis of the Kentucky case, or to point out the essential factual differences between it and the case at bar.

Invoking the well-recognized doctrine that where an instrument is susceptible of two constructions, one rendering it legal (nonusurious), and the other illegal, the former will be adopted, appellants next contend that the application is fairly susceptible of the construction that not more than 10 per cent. per annum interest was intended to be collectable. This is predicated upon the above-quoted paragraph of the application which begins, "Each year you are to compute," etc. The entire instrument is quite involved, and may be susceptible of more than one construction. We have given its various provisions careful consideration, and have been unable to reach the conclusion that it is susceptible of the construction that not more than 10 per cent. interest is collectable in any one year if note 2 be construed (as we hold it must be) as an interest note. We think this much is clear from the express terms of the instrument. Note 2 was to cover what was designated as expenses paid and to be paid by the bond company, over and above those deducted "from the proceeds of the loan." Note 3 was a compensation note to pay for services the bond company was to render in connection with the loan. Note 2 was expected to be negotiated, and expenses charged to the "proceeds." "If at any time the amount paid by us on note No. 2, together with interest paid thereon, should exceed said expenses you are to hold same and pay therefrom your actual reasonable expenses of the kind specified." This is susceptible of the construction that payments on note 2, both principal and interest, must not exceed the actual ex-

penses ultimately chargeable against the note, the overpayment to be held to meet future expenses.

Coming now to the annual computation clause: The second sentence clearly means that, if 6 per cent. on the unpaid balance of note 1, plus the payments on note 3, plus 6 per cent. interest on the balance standing to the credit of Sanders on note 2 (that is the unused balance resulting from deducting the entire accrued expenses from the entire proceeds of the note) shall at the end of any year exceed 10 per cent. on the unpaid balance of note 1, then interest on the unpaid balance of note 2 is to be credited at 6 per cent.

We do not see how any other meaning can be given to this paragraph. The sole consideration for note 2 was expenses thereafter to be paid by the bond company. As between the original parties interest was not properly chargeable except upon the amount of expenses paid out and from the date of payment; whereas the entire principal of the note representing these future payments of expenses bore interest payable unconditionally to the holder of that note. The interest paid on this note therefore as between the original parties represented interest on the accrued expenses charged against the proceeds of the note. To the extent that the expenses fell short of the proceeds, the interest paid upon the note would constitute interest upon a credit in favor of appellees —manifestly an improper charge. This was taken care of by adding the excess interest to the interest on note 1 and the payments on note 3, and, if this sum exceeded 10 per cent. of the unpaid balance of note 1, the excess interest paid on note 2 was credited back to interest on the accrued expenses charged to note 2. This we think is the most favorable construction to appellants of which the language of this paragraph, whether taken alone or in connection with other parts of the application, is susceptible.

In the end the bond company obligated itself personally to reimburse appellees to the extent of the credit to which the proceeds of note 2 was entitled under this set up.

We do not need to further burden this opinion with a discussion of other provisions of the application. It is clear that the expenses forming the consideration of note 2 were chargeable absolutely against the proceeds of that note, or in other words were absolutely payable by appellees. If we accept Mr. Viner's statement of these expenses, which is the only record evidence concerning them, they amounted to at least 17 per cent of the face of the loan. This was incurred in the sale of the bonds and presumably at the time note 1 was transferred to the Century Company in March, 1928. The entire payments for the first year of the loan were therefore a credit against this expense debit; and not returnable in any way to appellees. These payments amounted to $314.64, which added to the interest for the year on note 1 ($360) made $674.64 absolutely payable for the first year on notes 1 and 2, an excess of $74.64 above 10 per cent. of the face of note 1. Considering the expenses as an improper charge and therefore as interest, the transaction was manifestly usurious in the light of the construction of the application most favorable to appellants.

The latter do not favor us with a construction of the application as regards the manner of handling the expenses under note 2; nor do the books of the bond company introduced by them throw any light upon this subject. No expense account of any character is shown. The notes were credited prior to May 14, 1931, with total payment apportioned to, (1) interest on note 1, (2) interest on note 2, (3) principal on note 2, (4) principal on note 3. Prior to May 14, 1931, there were 32 credits on note 1. On that date note 2 was credited with $194.45 on principal, leaving a balance of $304.45 principal, and $181.56 was credited on note 3, paying it in full. After each credit a balance owing on principal of each note was drawn. The last credit was dated March 22, 1933. After entering this credit, the total payments credited were $4,356, apportioned as follows: Note 1, interest $1,779.36, principal $901.14, balance principal $5,098.86; note 2, interest $169.28, principal $884.14, balance principal $228.56; note 3, principal $622.08, no balance. There are a number of discrepancies between these credits and check payments testified to by Sanders other than the fact that only $73.50 of the $90 monthly payments appears to have been reported by Compton. We will note some of these discrepancies: Total book credits 50, total check payments 61. Prior to May 14, 1931, total book credits 32, total check payments 38.

On May 14, 1931, there was a book credit of $441. A plausible explanation of this credit is that the 6 credits short on the books were not reported by Compton until that date. The amount is exactly six times $73.50. The July, 1929, book credit was only $50, $6.50 of which was credited to interest on note 1. The July 3, 1929, book credit was only $23.50, all of which was credited to interest on note 1. If we consider the two July, 1929, credits ($23.50+$50=$73.50) as one payment, the May 14, 1931, credit as six payments, and the April 20, 1932, credit ($180) as two $90 payments, we have a total number of book credits 55 (50–1+5+1=55), or six short of the check payments. Thus it appears that the net of all discrepancies between the books and the checks results from failure to credit $16.50 out of the first 36 payments ($494), and total failure to give any credit for six of the remaining $90 payments ($540). These two items make up the difference ($1,134) between the total book credits ($4,356) and the total check payments ($5,490). It is quite plain therefore that the three notes were carried on the books of the bond company at their face value and the payments reported by Compton were credited accordingly. There is nothing in the bookkeeping in evidence to indicate that any expense account was kept or that any return to appellees was contemplated. This can be explained on one of only two hypotheses: Either that the expenses charged against note 2 at its inception were estimated at the full face of that note, and that therefore there could be no refund on that account; or that the application was disregarded altogether by the bond company. This circumstance alone would warrant the trial court's finding that the application was a mere ruse under which to cloak a usurious transaction. Appellants in their cross-action upon notes 1 and 2 make no allegation regarding any payments, or the application thereof, but merely ask for judgment on the notes and for foreclosure of the trust deed liens. In their brief they ask that the trial court's judgment be reversed and that judgment be rendered here in their favor. For what amount they do not state. We therefore assume that they are claiming the balance shown to be due on these notes by the books of the bond company, as there are no other data in the record from which the amount they are claiming can be ascertained. It follows, we think, that they approve the method of accounting shown by the bond company's books.

Appellants further urge that, even if the transaction be held usurious, they should recover additionally $1,134, the difference between the amount actually transmitted by Compton to the bond company ($4,356) and the amount paid to Compton by check ($5,490). Compton was not called as a witness, and we have no evidence other than the bond company's books, of what he transmitted; and no evidence whatever why he did not transmit the entire amount of the collections. Compton was the duly authorized agent of the bond company in negotiating the loan and making the collections. Sanders testified that the agreement was that he should discharge the loan at $90 per month, and the checks were delivered to Compton as agent of the bond company under that agreement. Payment to him, therefore, was payment to the bond company. It is to be noted that according to the face of the application and the notes $73.50 was to be paid monthly for 36 months. This entire sum was transmitted by Compton and the books of the bond company show that it received it. What became of the additional $16.50 paid during this period the record does not show. After the thirty-sixth payment the bond company was to be paid according to the face of the notes and application ($92.04 per month). Sanders made 25 $90 payments to Compton. The books credit only 19 such payments. Clearly the failure of Compton to transmit six of these payments to the bond company could not relieve the latter from responsibility to account for them.

The trial court correctly held that the $360 commission and $30 security bond premium were not proper charges against Sanders, and that the true amount of the loan was only $5,692.50. The entire payments of $5,490 were properly credited against this amount, and the proper judgment was therefore rendered.

The trial court's judgment is affirmed.

Affirmed.

NOTE: We cite as additional authority for our holdings the case of Trinity Fire Insurance Company v. Kerrville Hotel Company, 103 S.W.(2d) 121, this day decided by the Supreme Court.

NOTE:

Note No. 1 (Ans. 31)

| Date | Total Payment (Ans. 29) | Int. Original amount of note | Prin. | Bal. $6000.00 |
|---|---|---|---|---|
| Apr. 7, 1928 | $73.50 | $30.00 | | 6000.00 |
| May 7, 1928 | 73.50 | 30.00 | | 6000.00 |
| June 6, 1928 | 73.50 | 30.00 | | 6000.00 |
| July 7, 1928 | 73.50 | 30.00 | | 6000.00 |
| Aug. 6, 1928 | 73.50 | 30.00 | | 6000.00 |
| Sept. 13, 1928 | 73.50 | 30.00 | | 6000.00 |
| Oct. 15, 1928 | 73.50 | 30.00 | | 6000.00 |
| Nov. 9, 1928 | 73.50 | 30.00 | | 6000.00 |
| Dec. 10, 1928 | 73.50 | 30.00 | | 6000.00 |
| Feb. 4, 1929 | 73.50 | 30.00 | | 6000.00 |
| Mar. 29, 1929 | 73.50 | 30.00 | | 6000.00 |
| Apr. 27, 1929 | 73.50 | 30.00 | | 6000.00 |
| Apr. 30, 1929 | 73.50 | 30.00 | | 6000.00 |
| May 2, 1929 | 73.50 | 30.00 | | 6000.00 |
| June 12, 1929 | 73.50 | 30.00 | | 6000.00 |
| July 3, 1929 | 23.50 | 23.50 | | 6000.00 |
| July 27, 1929 | 50.00 | 6.50 | | 6000.00 |
| Aug. 1, 1929 | 73.50 | 30.00 | | 6000.00 |
| Aug. 30, 1929 | 73.50 | 30.00 | | 6000.00 |
| Oct. 1, 1929 | 73.50 | 30.00 | | 6000.00 |
| Jan. 2, 1930 | 73.50 | 30.00 | | 6000.00 |
| Feb. 4, 1930 | 73.50 | 30.00 | | 6000.00 |
| Mar. 6, 1930 | 73.50 | 30.00 | | 6000.00 |
| Apr. 4, 1930 | 73.50 | 30.00 | | 6000.00 |
| May 8, 1930 | 73.50 | 30.00 | | 6000.00 |
| June 9, 1930 | 73.50 | 30.00 | | 6000.00 |
| July 18, 1930 | 73.50 | 73.50 | | 6000.00 |
| Sept. 5, 1930 | 73.50 | 73.50 | | 6000.00 |
| Oct. 10, 1930 | 73.50 | 33.00 | | 6000.00 |
| Nov. 10, 1930 | 73.50 | 30.00 | | 6000.00 |
| Jan. 16, 1931 | 73.50 | 60.00 | | 6000.00 |
| May 8, 1931 | 90.00 | 90.00 | | 6000.00 |
| May 14, 1931 | 441.00 | 2.34 | 57.66 | 5942.34 |
| June 6, 1931 | 90.00 | 27.37 | 58.25 | 5884.09 |
| July 9, 1931 | 90.00 | 29.42 | 57.94 | 5826.15 |
| Aug. 8, 1931 | 90.00 | 58.26 | 16.86 | 5809.29 |
| Sept. 15, 1931 | 90.00 | 29.05 | 56.57 | 5752.72 |
| Nov. 1, 1931 | 90.00 | 57.52 | 23.72 | 5729.00 |
| Jan. 15, 1932 | 90.00 | 57.29 | 23.95 | 5705.05 |
| Apr. 20, 1932 | 180.00 | 85.58 | 81:28 | 5623.77 |
| May 26, 1932 | 90.00 | 56.24 | 25.00 | 5598.77 |
| June 10, 1932 | 90.00 | | 90.00 | 5508.77 |
| Aug. 2, 1932 | 90.00 | 55.09 | 26.15 | 5482.62 |
| Aug. 12, 1932 | 90.00 | | 90.00 | 5392.62 |
| Oct. 11, 1932 | 90.00 | 53.93 | 27.31 | 5365.31 |
| Nov. 10, 1932 | 90.00 | 26.83 | 58.79 | 5306.52 |
| Dec. 9, 1932 | 90.00 | 26.53 | 59.09 | 5247.43 |
| Jan. 12, 1933 | 90.00 | 26.24 | 59.38 | 5188.05 |
| Feb. 24, 1933 | 90.00 | 51.88 | 29.36 | 5158.69 |
| Mar. 22, 1933 | 90.00 | 25.79 | 59.83 | 5098.86 |
| Totals | $4,356.00 | $1,779.36 | $901.14 | |

| Date | Int. | Note No. 2 (Ans. 31) Prin. | Bal. | Note No. 3 (Ans. 31) Prin. | Bal. |
|---|---|---|---|---|---|
| | | | $1112.70 | | $622.08 |
| Apr. 7, 1928 | $ 5.56 | $ 20.66 | 1092.04 | $ 17.28 | 604.80 |
| May 7, 1928 | 5.46 | 20.76 | 1071.28 | 17.28 | 587.52 |
| June 6, 1928 | 5.36 | 20.86 | 1050.42 | 17.28 | 570.24 |
| July 7, 1928 | 5.25 | 20.97 | 1029.45 | 17.28 | 552.96 |
| Aug. 6, 1928 | 5.15 | 21.07 | 1008.38 | 17.28 | 535.68 |
| Sept. 13, 1928 | 5.04 | 21.18 | 987.20 | 17.28 | 518.40 |
| Oct. 15, 1928 | 4.94 | 21.28 | 965.92 | 17.28 | 501.12 |
| Nov. 9, 1928 | 4.83 | 21.39 | 944.53 | 17.28 | 483.84 |
| Dec. 10, 1928 | 4.72 | 21.50 | 923.03 | 17.28 | 466.56 |
| Feb. 4, 1929 | 4.62 | 21.60 | 901.43 | 17.28 | 449.28 |
| Mar. 29, 1929 | 4.51 | 21.71 | 879.72 | 17.28 | 432.00 |
| Apr. 27, 1929 | 4.40 | 21.82 | 857.90 | 17.28 | 414.72 |
| Apr. 30, 1929 | 4.29 | 21.93 | 835.97 | 17.28 | 397.44 |
| May 2, 1929 | 4.19 | 22.03 | 813.94 | 17.28 | 380.16 |
| June 12, 1929 | 4.07 | 22.15 | 791.79 | 17.28 | 362.88 |
| July 27, 1929 | 3.96 | 22.26 | 769.53 | 17.28 | 345.60 |
| Aug. 1, 1929 | 3.90 | 22.32 | 747.21 | 17.28 | 328.32 |
| Aug. 30, 1929 | 3.74 | 22.48 | 724.73 | 17.28 | 311.04 |
| Oct. 1, 1929 | 3.62 | 22.60 | 702.13 | 17.28 | 293.76 |
| Jan. 2, 1930 | 3.51 | 22.71 | 679.42 | 17.28 | 276.48 |
| Feb. 4, 1930 | 3.40 | 22.82 | 656.60 | 17.28 | 259.20 |
| Mar. 6, 1930 | 3.28 | 22.94 | 633.66 | 17.28 | 241.92 |
| Apr. 4, 1930 | 3.16 | 23.06 | 610.60 | 17.28 | 224.64 |
| May 8, 1930 | 3.05 | 23.17 | 587.43 | 17.28 | 207.36 |
| June 9, 1930 | 2.94 | 23.28 | 564.15 | 17.28 | 190.08 |
| Oct. 10, 1930 | 5.52 | 34.98 | 529.17 | | |
| Nov. 10, 1930 | 13.23 | 30.27 | 498.90 | | |
| Jan. 16, 1931 | 4.98 | | 498.90 | 8.52 | 181.56 |
| May 14, 1931 | 4.99 | 194.45 | 304.45 | 181.56 | |
| June 6, 1931 | 1.52 | 2.86 | 301.59 | | |
| July 9, 1931 | 1.51 | 1.13 | 300.46 | | |
| Aug. 8, 1931 | 4.43 | 10.45 | 290.01 | | |
| Sept. 15, 1931 | 1.45 | 2.93 | 287.08 | | |
| Nov. 1, 1931 | 2.87 | 5.89 | 281.19 | | |
| Jan. 15, 1932 | .2.80 | 5.96 | 275.23 | | |
| Apr. 20, 1932 | 4.09 | 9.05 | 266.18 | | |
| May 26, 1932 | 2.65 | 6.11 | 260.07 | | |
| Aug. 2, 1932 | 2.58 | 6.18 | 253.89 | | |
| Oct. 11, 1932 | 2.52 | 6.24 | 247.65 | | |
| Nov. 10, 1932 | 1.24 | 3.14 | 244.51 | | |
| Dec. 9, 1932 | 1.22 | 3.16 | 241.35 | | |
| Jan. 12, 1933 | 1.21 | 3.17 | 238.18 | | |
| Feb. 24, 1933 | 2.36 | 6.40 | 231.78 | | |
| Mar. 22, 1933 | 1.16 | 3.22 | 228.56 | | |
| Totals | $169.28 | $884.14 | $ | $622.08 | |

## Securities Corporation Trustee
### Refunding Trust

Ans. 32 Schedule of remittance to Trustees.

| Note No. 1, | Interest | $1,779.36 to Baltimore Trust Company, |
|---|---|---|
| | Principal | 901.14 to Baltimore Trust Company, |
| Note No. 2, | Interest | 169.28 to North American Trust Co.-Baltimore Trust Co. |
| | Principal | 884.14 to North American Trust Co.-Baltimore Trust Co. |
| Note No. 3, | Interest | |
| | Principal | 622.08 to North American Trust Co.-Baltimore Trust Co. |